RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0061p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

Case No: 1:12-cv-1338

WILLIAM RUSSELL GARDNER, et al.,

　　　　　　　　　*Plaintiffs-Appellants,*


　　*v.*

JASON EVANS, et al.,

　　　　　　　　　*Defendants-Appellees.*

Case No: 1:12-cv-914

HENRY LEE HOLSEY,

　　　　　　　　　*Plaintiff-Appellant,*


　　*v.*

AARON WIEBER, et al.,

　　　　　　　　　*Defendants-Appellees.*

No. 17-1933

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
Nos. 1:12-cv-00914; 1:12-cv-01338—Robert J. Jonker, Chief District Judge.

Argued:  January 17, 2019

Decided and Filed:  April 4, 2019

Before:  MERRITT, GUY, and MOORE, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**   J. Nicholas Bostic, Lansing, Michigan, for Appellants.   Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellees. **ON BRIEF:** J. Nicholas Bostic, Lansing, Michigan, for Appellants.   Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellees.

———————————

**OPINION**

———————————

RALPH B. GUY, JR., Circuit Judge.   Plaintiffs are Lansing, Michigan residents whose homes were raided by police and subsequently deemed uninhabitable.  Police raided the homes based upon search warrants for drugs, but once inside, they invited building code compliance officers in as well.  Plaintiffs sued under 42 U.S.C. § 1983 alleging a variety of constitutional claims against the police officers, the compliance officers, and the City of Lansing.  The district court granted summary judgment for defendants on all counts.  We affirm in part and reverse in part.

## I.  BACKGROUND

### A.  The Raids and Arrests

Some drug raids in Lansing appear to have followed a pattern.  In the course of their duties, police took notice of residences where they believed drug trafficking was occurring.  Through controlled buys, confidential informants, trash pulls, and direct surveillance, police officers amassed probable cause to secure search warrants.  Courts issued warrants and teams of officers soon executed them.  The searches were aggressive: officers knocked in doors with rams, used flashbangs and, according to plaintiffs, left the homes in complete disarray.  During or immediately following a search, a police officer would sometimes call a housing code compliance officer ("inspector") to the scene.  In some instances, the inspector would soon appear and inspect the home.  Reliably, the inspector would find code violations such as water heaters without inspection tags, bare electrical wiring, and non-working smoke detectors.  The inspector would then declare the home unsafe for occupancy, which is often called "red tagging."  When a home has been red tagged, the occupants must leave immediately and may not occupy the home until the violations have been corrected.

This pattern played out for each of the plaintiffs in this case.  They resided at four different Lansing homes and over the course of eleven months each of their homes was searched

and red tagged.  Some of the plaintiffs were arrested, but in each case the charges were dismissed.[1]

### B.  The Lawsuits

One of the residents, Henry Holsey, filed a federal § 1983 suit against the City of Lansing, an individual police officer, and an individual inspector.  The rest of the plaintiffs filed a single subsequent suit against other officers and inspectors, along with the City.  Given the cases' similarities, the district court consolidated them, although the two cases remained on separate active dockets.

Following discovery, defendants filed a motion for summary judgment in each case.  The district court granted summary judgment in favor of defendants on all counts, except "to the extent Defendants' Motion for Summary Judgment . . . seeks summary judgment in favor of [the Defendant inspectors] on Plaintiffs' claim that these Defendants failed to provide a constitutionally appropriate post-deprivation review process, and summary judgment in favor of the City of Lansing on Plaintiffs' claim that the City of Lansing has a policy and practice of failing to provide a constitutionally appropriate post-deprivation review process[.]"

The inspectors filed an interlocutory appeal, asserting that the district court erred in not granting them qualified immunity.  Defendants then moved to stay the proceedings pending the appeal.  The district court granted the stay, explaining that although there were good reasons to "keep the case moving toward the imminent trial process" it would instead exercise its discretion to stay the case principally because:

> [T]he Court sees relatively few issues of fact in the case, and believes a ruling from the Court of Appeals on the key legal issues will be helpful in moving the matter to conclusion, one way or the other.  In particular, the Court recognizes that the individual Defendants were using city forms as part of the challenged red tag process, and so the policy and practices claim, and the qualified immunity issues are likely to raise common and potentially controlling legal issues.

---

[1]The record includes evidence of a search of a fifth home, where two additional plaintiffs resided.  Those plaintiffs, however, are not parties to this appeal.

### C. The First Appeal

In their statement of the parties and issues before this court, the inspectors limited their appeal to a single question: "whether the individual inspectors are protected with qualified immunity from plaintiffs' due process claims?" Briefing and argument followed, and we reversed the district court's denial of qualified immunity and remanded the case. *Gardner v. Evans*, 811 F.3d 843, 848 (6th Cir. 2016). The district court had reasoned that one of our prior cases, *Flatford v. City of Monroe*, 17 F.3d 162, 167 (6th Cir. 1994), had clearly established that a meaningful post-deprivation review process is constitutionally required, and "that direct, personal notice of such a process to affected individuals is also required." *Gardner v. Evans*, No. 1:12-cv-1338, 2015 WL 403166, at *18 (W.D. Mich. Jan. 28, 2015) (*Gardner I*). We held, however, that *Flatford* was distinguishable and concluded that "any inadequacies in the notice provided by the Inspectors would not have been apparent to a reasonable official solely upon the basis of *Flatford*." *Gardner*, 811 F.3d at 847. Accordingly, we stated:

> For purposes of deciding this case, we need not determine whether the red-tags provided by the Inspectors meet the constitutional notice standard that we have just outlined. Even if we assume, without deciding, that the Tenants are correct and that the red-tags were constitutionally infirm, the Tenants cannot satisfy the second prong of the qualified immunity analysis, namely, whether this constitutional notice requirement was clearly established.

*Id.*

### D. The Remand

The contours of the remand proved contentious. Defendants asserted that the only matter properly left for the district court to decide was whether the content of the notices given to plaintiffs after their homes were red tagged were "constitutionally sufficient to satisfy post-deprivation due process." Plaintiffs conceded that this court's decision immunized the inspectors against claims about the content of the notices, but they insisted that there was still an open question as to their immunity. Plaintiffs asserted that they could still prevail on the theory that the inspectors failed to give post-deprivation notice of any kind—a theory they admittedly had not raised until that point. Given the theory's belated introduction, the district court declined to

permit an amendment to the pleadings or further discovery and simply allowed plaintiffs and the City to file cross motions for summary judgment.

The plaintiffs and the City each filed motions for summary judgment. The district court granted the City's motion and denied plaintiffs'. It then entered judgment in favor of all named defendants and against all named plaintiffs, based upon both its pre-appeal and post-appeal opinions. Plaintiffs appealed.

## II. DISCUSSION

### A. Invalid Search Warrants

All the initial searches in this case were made pursuant to warrants. The evidence supporting each warrant varied, and we discuss each below. Our standard for reviewing them, however, is common to all.

The Fourth Amendment requires warrants to be supported by "probable cause," which we have defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion [that] there is a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (internal citations and quotation marks omitted). We judge an affidavit that supports a warrant "on the totality of the circumstances, rather than line-by-line scrutiny" to ensure that the judicial officer who issued the warrant could properly consider the "veracity and basis of knowledge of persons supplying hearsay information" and properly determine that there was "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000)).

### 1. 923 W. Hillsdale – The Gardner House

Two police officers' information led to the search of William Gardner's house on Hillsdale Street. According to a police report, on December 3, 2009, Officer Lynne Mark of the Mason Police Department received an in-person tip from a citizen. The citizen identified himself and explained that a family member had been held at gunpoint over a drug deal. The citizen gave Officer Mark a note that read, "Oxicotton – Irma Gardner Hillsdale Lansing" and consented

to be contacted by the police if necessary.  The next day, Officer Mark verified that one "Erma Gardner" indeed lived on that street, so Mark passed the information along to the Lansing Police Department, which has jurisdiction over the address.  The report came to Lansing Police Officer Jason Evans.  According to Officer Evans's affidavit, he picked up the trash in front of the Hillsdale house on December 9, 2009.  In it he found cocaine residue, a used syringe tube, and packaging materials which, in Evans's experience, are the type used in drug trafficking.  Evans also found residency paperwork linking one "Erma G. Williams" to the address, and he stated that a search in the police department's record system confirmed that "Erma G. Williams" and "Irma Gardner" are the same person.  A Lansing district court judge signed a search warrant based upon Evans's affidavit on the same day that Evans searched the trash, and the warrant was executed the next day.

William Gardner attacks the warrant on three grounds.  He contends that the affidavit lacked enough information to connect Irma Gardner to the address, the informant was not reliable, and the information was stale by the time the warrant was executed.  We reject all three arguments.

To begin, the warrant was not stale.  Although the record does not reveal when the citizen tipster's family member was held at gunpoint, it was evidently urgent enough that he approached the Mason police officer at a chamber of commerce event to report it.  After he did, the police moved swiftly to obtain and execute the warrant.  There was also enough evidence to link Erma Gardner to the address because the warrant did not hinge solely on the informant's information. The subsequent trash pull revealed evidence that Erma Gardner indeed still lived at the address and at least someone in the home was handling drugs.  The trash pull also made the informant's reliability a non-issue.  Armed with the informant's tip, Officer Evans confirmed that there was good reason to believe drug activity was happening in the home.  Accordingly, the district court properly found that probable cause supported the warrant.

### 2.  3622 Karen Street – The Hudson House

James Hudson owned his home on Karen Street and in 2010 he lived there with family members Roosevelt and Javon Hudson.  James Hudson had a history of dealing drugs from the

Karen Street house. According to Lansing Police Officer John Cosme's affidavit, Hudson was arrested at the same address in 2006 after a warranted search turned up heroin, marijuana, crack cocaine, and ten firearms. So, when in April 2010 an anonymous source informed Cosme that the home was again being used as a drug house, Cosme visited the address. There he observed five garbage bags on the curb in front of the home. He asked the garbage truck driver to deliver the bags to a separate truck parked nearby. Cosme searched the garbage bags and found a baggie with cocaine residue along with residency paperwork for Hudson. A magistrate signed a warrant based upon the affidavit on April 30, and it was executed that same day.[2]

The Hudsons challenge the warrant on staleness grounds. When the district court rejected this argument, it observed that the "crime at issue was drug trafficking from a particular residence—more a regenerating conspiracy by an entrenched criminal from a secure operational base than a fleeting encounter." *Gardner I*, 2015 WL 403166, at *13. The court thus concluded that under our decision in *United States v. Frechette*, 583 F.3d 374 (6th Cir. 2009), "the information in the affidavit was not stale." *Id.*

*Frechette* concerned a search warrant for child pornography that was based on an online purchase made 16 months earlier and linked to a specific street address. *Frechette*, 583 F.3d at 377. We reasoned that "child pornography is not a fleeting crime" and thus "the same time limitations that have been applied to more fleeting crimes do not control the staleness inquiry for child pornography." *Id.* at 378 (quoting *United States v. Paull*, 551 F.3d 516, 522 (6th Cir. 2009)). We contrasted this with drug trafficking crimes, where evidence goes stale more quickly "in the absence of information indicating an ongoing and continuing narcotics operation." *Id.* (quoting *United States v. Kennedy*, 427 F.3d 1136, 1142 (8th Cir. 2005)). When a criminal enterprise is ongoing at the same location, "the passage of time becomes less significant." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001).

---

[2]The dates that Cosme received the tip and pulled the trash are not clear. According to his affidavit, he got the tip on April 17 and pulled the trash on April 10. He conceded in his deposition that these dates must be wrong, because the tip preceded and led to the trash pull. As the district court pointed out, however, there was no evidence that the trash pull occurred any earlier than April 10, 2010.

Here, the warrant was issued 20 days after Cosme discovered the baggie. The only other evidence of an ongoing operation was the drug activity from four years earlier. A finding of probable cause is therefore tenuous. We decline to resolve the matter, however, because even if the evidence was too stale to establish probable cause, we conclude that "the warrant [was not] so lacking in indicia of probable cause that official belief in the existence of probable cause [was] unreasonable." *Mills v. City of Barbourville*, 389 F.3d 568, 577 (6th Cir. 2004). Accordingly, we affirm the district court's grant of summary judgment to Cosme as to the search claim on the basis of qualified immunity.

### 3. 1043 Bensch Street – The Louden House

Controlled buys led to the search of Keosha Louden's home. According to Lansing Police Officer Dylan Zehr's affidavit, he had been investigating suspected drug trafficking from Louden's Bensch Street home. On April 15, 2010, he staged a controlled buy. After searching a confidential informant and equipping him with prerecorded currency, Zehr dropped the informant off near Louden's home with instructions to purchase crack cocaine inside. The informant met with a man outside the home and the two went in. They reemerged soon after and the informant got back into Zehr's car. The substance given to the informant within the home field-tested positive for cocaine. On the basis of this information, a magistrate signed a search warrant for the home on April 16, and it was executed that same day.

Although Louden challenged the validity of the warrant in the complaint and identified it as an issue on appeal, she did not pursue any discussion of it in her briefs. We therefore consider the argument abandoned.

### 4. 914 Pompton Circle – The Holsey House

A lengthy investigation of another suspected drug dealer, a man named Woods, led police to Henry Holsey's home on Pompton Circle. According to Lansing Police Officer Aaron Wieber's affidavit, on March 30, 2009, Lansing police witnessed Woods sell cocaine to a confidential informant. When the deal was over, the police followed Woods as he drove to and then entered 914 Pompton Circle. Nine days later, the confidential informant arranged another purchase from Woods. This time, police were watching the Pompton house. They observed

Woods's car there and watched him go directly from the house to the drug deal. When the deal was over, Woods returned to the Pompton house. A week later, the police staged another controlled buy with Woods. Although this time he came to the deal from another location, he again went directly to Pompton after the deal was over. Later that month, the Federal Drug Enforcement Agency used a camera to monitor the Pompton house and agents observed Woods come and go from the house, without knocking, at least 20 times. More controlled buys followed, but for these, Woods came and went from a separate address on Michigan Avenue. On June 17, 2009, however, Woods departed the Michigan Avenue address, spent fifteen minutes at the Pompton house,[3] and then returned to Michigan Avenue.

Through his affidavit, Officer Wieber averred that Woods was likely using both the Pompton address and the Michigan Avenue address in furtherance of his drug-trafficking operation. Based on the affidavit, a Lansing district court judge signed a search warrant for the Pompton address on June 22, 2009. The warrant was executed the same day.

Holsey argues that there were insufficient reasons to rely on the informant's information and not enough evidence to link the drug trafficking to his home. The argument concerning the informant's reliability is easily dispensed with because the warrant did not rest on the informant's reliability. The police used him to execute controlled buys, which they orchestrated and closely monitored. In this case, the affiant's "personal knowledge" of the informant is of no moment.

The nexus of the home to drug trafficking was also sufficient. The affidavit did not link Holsey himself to any drug transactions, but it did implicate his home. "The critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). "Thus, in determining whether the warrant affidavit supplied probable cause, the only relevant question is whether the affidavit gave a reasonable basis for believing there were drugs or

---

[3]The affidavit is slightly unclear on this point. It states that Woods left the Michigan Avenue address "and went to 1309 W. Jolly Rd.1316 Pompton where he stayed for approx. 15 minutes. WOODS then drove back to" the Michigan Avenue house and went inside.

evidence of drug trafficking" at the Pompton house. *United States v. Burney*, 778 F.3d 536, 540 (6th Cir. 2015). Here, a known drug dealer came and went from the searched home repeatedly, and on at least three occasions did so immediately before or after a controlled drug buy. Taken as a whole, the affidavit demonstrates that the nexus between the known drug dealing and the Pompton house was sufficient to establish probable cause for the search.

## B. Unreasonable Destruction

All the parties agree that some measure of disarray will likely result from a search. Plaintiffs contend, however, that the searches of their homes were unreasonably destructive in violation of the Fourth Amendment. The claims and evidence of the search in each home are summarized below.

### 1. 923 W. Hillsdale – The Gardner House

Evidence of the damage done to William Gardner's home is limited to his answers to interrogatories and his affidavit. According to his affidavit:

> [T]he officers damaged or disabled smoke/fire detectors, dumped food and cooking ingredients on the floor and countertops, removed chilled or frozen meat from the refrigerator/freezer and left it out to spoil, dumped over beds and furniture, removed clothing and other personal items from closets, cabinets and dressers leaving hallways, passageways, doorways and other pathways blocked and cluttered.

His interrogatory answers also listed specific items that were damaged, including a dryer vent, a floor drain cover, light fixtures, smoke detectors, and damage to walls.

### 2. 3622 Karen Street – The Hudson House

The only evidence of damage done to the house on Karen Street comes from James Hudson's affidavits. Hudson claimed that he "offered keys to the police for two locked doors and a locked freezer but they kicked in the two doors and pried open the freezer," and though the "bedroom door had keys in the lock," the police officers "broke the keys off after breaking down the door." He also swore that officers disabled smoke alarms, turned over beds, removed clothing and other personal items from closets, and left pathways blocked and cluttered.

### 3. 1043 Bensch Street – The Louden House

Keosha Louden provided an affidavit and interrogatory answers to support her damage claims. She testified through her affidavit that the police officers clogged up a pipe in the basement that caused sewage to accumulate, dumped over beds, and removed items from closets and left them blocking pathways. She also swore that the officers dumped out garbage bags, dumped out food that resulted in "an infestation of rodents and insects," knocked an electrical outlet and conduit loose from the wall, stuffed "foreign objects into ductwork and registers and placed flammable materials near appliances with pilot lights." In her interrogatory answers, she asserted that five of the code deficiencies were caused by the police during their search: (1) hazardous plumbing, (2) inadequate sanitation, (3) faulty weather protection, (4) hazardous electrical wiring, and (5) hazardous mechanical equipment.

### 4. 914 Pompton Circle – The Holsey House

Evidence of destruction at Holsey's home was limited. During his deposition, Holsey testified that officers dumped his clothes out of his closet, flipped his bed, broke open bags of flour and corn meal, dumped everything out of his freezer, and left empty bottles of shampoo on the bathroom floor. In his brief, Holsey contends that he also testified that other code violations did not exist when he was told to leave his home, but the cited portions of his deposition do not support such a claim. The code inspector took photographs of the home, but the copies in the record are of poor quality.

### 5. Analysis

The district court found that plaintiffs failed to create "a jury-submissible issue on whether officers exceeded reasonable limits in execution of the search warrants." *Gardner I*, 2015 WL 403166, at *15. We disagree.

The needs of any given search will vary, and thus "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant—subject of course to the general Fourth Amendment protection 'against unreasonable searches and seizures.'" *Dalia v. United States*, 441 U.S. 238, 257 (1979)

(footnote omitted). This case-by-case inquiry is governed by a standard of reasonableness, and when there are material factual disputes, the question of reasonableness is left to the jury. *See Hill v. McIntyre*, 884 F.2d 271, 277–78 (6th Cir. 1989).

There are material factual disputes here. The destruction to the homes detailed above is serious and if plaintiffs were as compliant as they allege, the level of destruction was possibly neither necessary nor reasonable. *Cf. Bonds v. Cox*, 20 F.3d 697, 702–03 (6th Cir. 1994) (holding that "broken doors, mutilated vinyl siding, a cracked commode, holes in walls, broken dishes, and trampled personal belongings" constituted a seizure and remanding for a determination as to reasonableness). In *Hill*, we made special mention of how the officers executing a search warrant for drugs "broke open numerous packing boxes in the various rooms of the house, spilled out dry goods, [and] poured food on the floor," and remanded the case so that a jury could determine the reasonableness of the search. 884 F.2d at 274.

The plaintiffs here make similar allegations and worse. For instance, Gardner, Louden and Holsey allege that food was removed from their freezers and left out—including meat—and in the case of Louden, a rodent infestation followed. The damage allegedly done in each search was compounded by the red tagging that followed the search. Rummaging through drawers and flipping over mattresses is somewhat to be expected in a search for small contraband. The tearing open of dry goods and even the removal of refrigerated items may be justified when searching officers have reason to believe that drugs have been cleverly concealed. But this is different from causing code violations, calling for a code inspector based on those violations, and in doing so, keeping the residents from entering the home to clean up the mess for the better part of a month. There are sufficient facts in dispute to make the district court's basis for granting summary judgment inappropriate.

Nevertheless, the defendant police officers are entitled to summary judgment for a different reason. "Under § 1983, there is no *respondeat superior* or vicarious liability." *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992)). Rather, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). A plaintiff must therefore show how each defendant "directly participated in the alleged misconduct, at least by

encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself." *Flagg*, 715 F.3d at 174 (quotation marks and citation omitted).

Plaintiffs fail to make the necessary showings. They blame Evans for the damage to the Gardner house, but they concede that Evans was not present when the search warrant was executed. They blame Wieber for the damage at the Holsey house, but he testified that he arrived at the house after the search was complete and plaintiffs offer no rebutting evidence. Zehr and Cosme were present for the searches of the homes they are accused of damaging (the Louden and Hudson homes, respectively) but plaintiffs point to no evidence that the officers personally caused any of the alleged damage or observed others causing it.

Plaintiffs argue that the named officers should still be held liable because they were the affiants for the warrants that led to the searches, but plaintiffs fail to provide any precedent for such a theory of liability. The cases they rely on involved police officers who were personally present for fellow officers' alleged misconduct but failed to intervene. *See Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Such scenarios are a well-established basis for liability, but a far cry from holding a warrant's affiant liable for the fallout when that warrant is executed. To the contrary, we have emphasized that even an officer who is present at the scene of a search is not subject to liability "without a showing of direct responsibility for the action[.]" *Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984); *see also Burley v. Gagacki*, 729 F.3d 610, 620 (6th Cir. 2013) (affirming summary judgment for officers who were not in a home where excessive force was alleged to have occurred, but were instead providing perimeter security outside).

"Our cases teach that, in order to hold [an officer] liable for the use of excessive force, [the plaintiff] must prove that he (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Turner*, 119 F.3d at 429. Plaintiffs have not provided evidence that the defendants' role as affiants placed them in any of those three categories. The defendant police officers were therefore entitled to summary judgment. At the district court, plaintiffs also sought to hold the City liable for the alleged damage, but they do not pursue that claim on appeal, thus ending the matter.

C.  Invasion of Privacy

Plaintiffs assert that the police officers violated their right to privacy, protected by the Fourth Amendment, by inviting the inspectors into the homes.  They contend that inviting the inspectors into their homes exceeded the officers' authority under the search warrants.  The district court granted summary judgment to the police officers because "the code inspectors had authority to enter Plaintiffs' premises on the strength of the criminal search warrant being executed by police officers without going through the formality of obtaining a separate administrative warrant" and thus found "no constitutional violation based on this claim." *Gardner I*, 2015 WL 403166, at \*16.[4]

Plaintiffs liken their case to *Bills v. Aseltine*, 958 F.2d 697 (6th Cir. 1992).  There, police officers believed two General Motors employees had stolen equipment from the company's proving grounds.  The police obtained a warrant to search the employees' home only for a specific generator.  One of the police officers conducting the search, however, invited a security guard from General Motors to come along with the intention that the guard might be able to identify other GM equipment in plain view.  The district court granted summary judgment for the officers, reasoning that non-officers may be present during a search when acting in aid to an officer's search.  We reversed, and explained:

> The available evidence seems to show that police actively procured a private person to tour plaintiff's home with a camera for purposes utterly unconnected with the search warrant they had already executed.  Whether this breached the trust under which they held the premises in their complete command, or whether, stated another way, this unreasonably exceeded the scope of the warrant, is a question for a jury in this case.  Summary judgment should not have been granted.

958 F.2d at 705.

This case is distinguishable from *Bills* in two ways.  The first difference concerns timing.  In *Bills*, the police officer invited the security guard prior to conducting the search and entering the home.  Here, the police officers contacted the inspectors only after entering the home

---

[4]The district court granted summary judgment to the City for the same reason.  But as with the claims concerning the execution of the search warrants, plaintiffs did not pursue this particular claim against the City on appeal.

pursuant to the warrant and discovering the code violations.  The second difference concerns the invitees.  Here, unlike *Bills*, the invitees were state actors who, under the right conditions, may search a home themselves.  These differences do not render *Bills* inapplicable, but they compel us to separate the police officers' actions into two stages: reporting the code violations to the inspectors and then admitting them into the residences.

On the matter of reporting the violations, we agree with the district court's grant of summary judgment for defendants.  We have explained that "the plain view exception permits the warrantless seizure of an object provided that (1) the officer is lawfully positioned in a place from which the object can be plainly viewed; (2) the incriminating character of the object is immediately apparent; and, (3) the officer has a lawful right of access to the object itself." *United States v. Bishop*, 338 F.3d 623, 626 (6th Cir. 2003) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)).  We have already concluded that the officers entered each house under a valid warrant.  The disconnected smoke alarms and exposed wiring would be apparent even to someone untrained in local building codes.  It was thus permissible and perhaps incumbent upon police officers to alert housing officials of the safety hazards in the homes.

There is a difference, however, between alerting housing officials of a possible violation and opening the door to those officials once they arrive.  As we explained in *Bills*, when police execute a search warrant, they "are temporarily placed in control of the premises and its occupants" and it "is as though the premises were given to the officers in trust for such time as may be required to execute their search in safety and then depart." *Bills*, 958 F.2d at 704.  But they "may violate that trust and exceed the scope of the authority implicitly granted them by their warrant when they permit unauthorized invasions of privacy by third parties who have no connection to the search warrant or the officers' purposes for being on the premises." *Id.*  Here, the police officers were given specific permission to search the houses for cocaine or other controlled substances along with the paraphernalia for mixing, packaging, and selling it— nothing more.  Allowing inspectors into the home would not have aided them in finding those things.

Even so, defendants suggest that because the criminal search was "far more intrusive" than a search by inspectors, plaintiffs lacked an expectation of privacy.  To begin, it is not a

foregone conclusion that a code-compliance search is necessarily less intrusive than a search for drugs. More importantly, we have held that additional parties must generally have their own warrants.

In *United States v. Sanchez*, we held that an ATF agent had no right to be present during a warranted search for drugs, let alone conduct his own search, even though the same informant had told police that the home had both drugs and explosives within it. 509 F.2d 886, 890 (6th Cir. 1975). We explained that "the warrant authorized only the local officers to enter and search the [home] for narcotics. It could not be used to validate the entrance of a federal officer having both probable cause and the opportunity to obtain a separate warrant to search for different items of property." *Id.* at 889.

The same holds true here. The City of Lansing empowers inspectors to inspect homes to "secure compliance" with the City's building code. *See* Lansing, Michigan Code of Ordinances § 1460.45(B) ("Housing Code"). The police officers' search warrants had nothing to do with building code violations, and thus provided no authority for the inspectors to join the officers in the house. Admittedly, police officers do "have the implicit authority under a search warrant to conduct a protective sweep to assure their safety and their control over the premises." *Bills*, 958 F.2d at 705. But there is nothing in the record to suggest that an on-site inspector was necessary to confirm it was safe for the officers to search the homes. To the contrary, there is evidence that the searches were entirely complete by the time the inspectors arrived. The police officers simply had no authority to admit third parties—even state actors—who had no warrant and could provide no assistance to the police officers' own searches. We therefore reject the district court's basis for granting summary judgment to the police officers on the invasion-of-privacy claims.

Once again, however, we must assess each defendant's liability individually and "based on his own actions." *Binay*, 601 F.3d at 650. There is very limited evidence that the named police officers admitted the inspectors into the homes, and there is other evidence that suggests they did not. Evans is accused of admitting inspector Brand into Gardner's home, but Evans testified that he was only at the house very briefly and that he was not the one who called for an inspector. For his part, Brand testified that he asked permission to enter Gardner's house and a man about Gardner's age who sat handcuffed on the couch assented. Cosme is accused of

admitting inspector Scrimger into the Hudson house, but he had no specific recollection of who called for or admitted an inspector. And Scrimger could not remember which officer greeted him when he arrived at the house, but he testified that a man claiming to be the owner of the house gave him permission to enter it. Zehr is accused of admitting inspector Sanford into Louden's home, but he did not testify on the matter. Although Sanford testified that a police officer admitted him into the house, he could not recall who it was. Finally, Wieber is accused of admitting Sanford into Holsey's home, but he testified that he was only there for less than five minutes and Sanford testified that an officer by the name of Johnson admitted him into the house.

The only evidence that directly implicates the named police officers are the plaintiffs' affidavits. Each affidavit contains a single sentence on the matter and uses the same phrase. For example, Gardner's states, "While Officer Evans had control of 923 W. Hillsdale, he invited and allowed Code Compliance Officer David Brand from City of Lansing's Office of Code compliance in to Affiant's residence without asking for consent from Affiant." Louden's and James Hudson's affidavits read the same way, but with the names and addresses changed. Each affidavit purports to be based on "personal knowledge," but none provides further context on whether the affiant observed the admission of the inspector, or how the affiant came to identify the police officer by name or concluded that the officer "had control" of the house.[5] The affiants' assertions that the named defendant officers "had control" of each house seems instead to track plaintiffs' erroneous legal assertion that the officer who serves as the affiant in securing a search warrant assumes control of the premises searched.

The posture of this case requires us to look at the evidence in the light most favorable to plaintiffs. In doing so, we neither make credibility determinations nor weigh the evidence. *Ingram v. City of Columbus*, 185 F.3d 579, 586 (6th Cir. 1999) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)). But plaintiffs must present more than the "mere existence of a scintilla of evidence" to support their position such that "reasonable jurors could find by a

---

[5]Holsey's affidavit is the outlier. It states, "I was present when a person entered and identified himself as a code compliance officer and placed a red-tag on my home." But his affidavit does not state that a police officer admitted the code compliance officer, much less identify the police officer by name.

preponderance of the evidence that [they are] entitled to a verdict[.]" *Anderson*, 477 U.S. at 252. Thus, a form affidavit that fails to explain how an unsupported conclusion was reached—and is repeatedly contradicted by other evidence—can fail to constitute competent evidence establishing a genuine issue of material fact. *See, e.g.*, *Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993).

Plaintiffs have not presented sufficient evidence that the named police officers admitted the inspectors. The inspectors are therefore entitled to summary judgment on those claims.

### D. Warrantless Search by the Inspectors

The Fourth Amendment protects the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and states that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The Supreme Court has therefore held that searches of homes "conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are per se unreasonable subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015). We recently noted that one such exception is an "administrative search[] designed to assure compliance with building codes, including codes designed to prevent buildings from becoming dangerous to tenants or neighbors." *Benjamin v. Stemple*, 915 F.3d 1066, 1069 (6th Cir. 2019) (citing *Patel*, 135 S. Ct. at 2452). In such cases, however, if the search is made without a warrant, the person whose home is to be searched "must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Patel*, 135 S. Ct. at 2452. "Although the Supreme Court 'has never attempted to prescribe the exact form an opportunity for precompliance review must take,' the review scheme at a minimum must give the property owner a meaningful chance to contest an administrative-search request in front of a neutral party before the search occurs." *Stemple*, 915 F.3d at 1069 (quoting *Patel*, 135 S.Ct. at 2452).

The City of Lansing has a comprehensive scheme for enforcing its housing code. Among other things, its housing code explicitly requires inspectors to obtain a warrant from a court in all

non-emergency situations.  *See* Housing Code § 1460.47(a), (d).  The code provides the process to obtain one:

> The Manager of Code Compliance shall prepare the warrant, stating the address of the structure to be inspected, the nature of the inspection, as defined in this Code or other applicable codes or statutes, and the reasons for the inspection. It shall be appropriate and sufficient to set forth the basis for inspection established in section 1460.45 (Inspections).  If the warrant is issued pursuant to section 1460.45, it shall state that it is for the purposes set forth in 1460.45.

*Id.* § 1460.47(b).  Notably, if the Office of Code Compliance requests an inspection, the housing code requires landlords to notify tenants of the request and "make a good faith effort to obtain permission for an inspection from them, and arrange for the inspection." *Id.* § 1460.45(e).

The parties agree that the inspectors failed to give plaintiffs any notice or opportunity for review prior to red tagging their homes.[6]  And they agree that the inspectors failed to obtain warrants prior to entering and searching the plaintiffs' homes.  There is a factual dispute as to whether some of the plaintiffs consented to the searches, but for the purposes of evaluating defendants' motions for summary judgment, the district court presumed there was no consent to any of the searches. We do the same here and therefore face two questions.  First, were the inspectors' warrantless searches of plaintiffs' homes unconstitutional?  And second, if so, was the right of plaintiffs to be free from such searches clearly established at the time?

We begin with the second question and hold that the right to be free from a warrantless code-compliance search with no alternative pre-compliance review was clearly established at the time plaintiffs' homes were searched.  The Supreme Court affirmed this right in *Camara* and has reaffirmed it since then.  *See, e.g.*, *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978); *see also* *Patel*, 135 S. Ct. at 2452 (reaffirming *Camara*, although postdating the searches here).  The district court seemed to reach the same conclusion in its own analysis.  *See Gardner I*, 2015 WL 403166, at *16 (citing *Camara*).  But the court then concluded:

---

[6]This contrasted with Holsey's prior experiences.  Prior to the search, an inspector had inspected Holsey's home, inside and out, three separate times.  After the first visit, the inspector noted several violations that needed correction.  When the inspector returned, he confirmed that the violations had been corrected.  The inspector visited a third and final time one month before the search at the prompting of a neighbor.  The inspector did not cite any violations.

> [T]he code inspectors had authority to enter Plaintiffs' premises on the strength of the criminal search warrant being executed by police officers without going through the formality of obtaining a separate administrative warrant. Each of the code searches involved here occurred during, or immediately after, execution of a criminal search warrant, and each was based on information directly observed by officers executing the search warrant. Under those circumstances, to require a code officer to obtain a separate administrative warrant would be an empty formality.

*Id.*

We disagree. To the extent that police officers incidentally discovered code violations in the process of executing their own search warrant, their call to the Office of Code Compliance would serve only as an antecedent for an inspector to either seek permission from the owner or occupant to search the premises, or failing to get such permission, to seek a warrant from a court. That a warrant would likely issue is of no moment. *Cf. Sanchez*, 509 F.2d at 888 (holding that police officers should have secured an additional warrant for explosives in the two hours before their midnight search for drugs). Securing either permission or a warrant is a necessary step demanded by the Fourth Amendment and not an empty formality.

The defendant inspectors also argue that exigent circumstances justified their warrantless entry. Warrantless entries into homes do not violate the Fourth Amendment if they are necessitated by exigent circumstances. *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996). Here, however, there is a genuine issue of material fact concerning whether the inspectors could have reasonably believed that exigent circumstances excused the warrant requirement in each case. There is no record evidence indicating the inspectors even contemplated securing warrants, much less that they believed the homes' conditions posed an emergency or that time was of the essence. One of the police officers testified that Lansing police officers call for immediate follow-up inspections by inspectors in around 90% of the drug raids that they conduct. A reasonable jury could find that such routine use of the inspectors in these situations precludes concluding that the inspectors believed exigent circumstances existed each time they were called. Inspectors Brand, Scrimger, and Sanford are therefore not entitled to summary judgment on the Fourth Amendment counts.

This does not mean, however, that plaintiffs are necessarily entitled to judgment as a matter of law.  As noted, the parties dispute whether plaintiffs gave consent to the inspectors.  If they did, no warrant was needed.  There is therefore a genuine issue of material fact.  Moreover, exigent circumstances, narrow as they are, can forgive an inspector's failure to obtain a warrant. The condition of the homes and the nature of the code violations are other fact questions that are properly put to a jury.

### E.  Due Process Surrounding the Red Tags

Plaintiffs bring a three-part due-process challenge against the way their homes were red tagged and the fallout that followed.  As we have already noted, red tagging automatically excludes occupants from their homes, so plaintiffs allege that the placement of a red tag deprived them of their property rights.  Plaintiffs' first two arguments concern the initial tagging: they claim (1) that the inspectors arbitrarily red tagged their homes; and (2) because the alleged code violations did not pose emergencies, they were entitled to pre-deprivation notice prior to the tagging (i.e., notice that their homes would be red tagged).  In their third argument, plaintiffs assert that defendants failed to provide them notice of their right to appeal the red taggings after they occurred.

### 1.  Pre-Deprivation

We begin with the pre-deprivation claims and look to our decision in *Flatford v. City of Monroe* as a guide.  In that case, a building inspector evaluated an apartment building pursuant to a warrant.  After the inspector discovered "dilapidation and disrepair" that was "among the worst he had seen" and fearing that tenants "faced an immediate risk of electrocution or fire," he "conferred with the city attorney, posted condemnation signs on all entrances and . . . ordered the building vacated within two and a half hours."  17 F.3d 162, 165 (6th Cir. 1994).  Some tenants sued, alleging that they were not afforded adequate pre-deprivation notice.  Those tenants, like the plaintiffs in this case, asserted that the immediate evacuation was too rash given that the violations could be quickly and easily remedied.  *Id.* at 168.  We concluded that the record contained "facts from which a reasonable building inspector could conclude that the

occupants . . . might be imminently endangered," and therefore held that the inspector was entitled to qualified immunity. *Id.*

When viewing the evidence in a light favorable to plaintiffs in this case, we cannot reach the same conclusion here. The record does not clearly establish what some of the cited code violations entailed, nor does it reveal the severity of the risks posed by the violations. Take James Hudson's home. The only evidence in the record detailing his home's code violations is a notice issued by the Office of Code Compliance. Many of the violations are minor enough that they would plainly fail to justify a red tag: the smoke detector was not installed high enough, the caulk in the bathtub had deteriorated, and some of the electrical outlets were missing covers. Others are too vague to allow one to decipher their severity, such as accumulation of "debris" which was purportedly a violation of the code's prohibition against inadequate sanitation and hazardous or unsanitary premises. Defendant Scrimger, who performed the inspection, provided little additional clarity during his deposition. The other notices and inspectors' depositions present comparable ambiguities.

In their depositions, some inspectors were unable to articulate standards by which they judged when a code violation became sufficiently severe to justify the application of a red tag and the immediate eviction of the home's occupants. They arguably did not note that any sense of urgency or particular emergency animated their decisions to red tag the homes in question. The inspectors sometimes used "standard language that comes up on the computer" to detail the conditions of the homes rather than articulating any specific or particularly pressing danger that they might have observed. Some of the incident reports generated by the police note that the homes were red tagged because of "unsatisfactory living conditions." It stands to reason, however, that a living condition may be "unsatisfactory" without rising to the level of an emergency justifying the immediate deprivation of an exceedingly important property interest without the benefit of a hearing.

In sum, there is a genuine dispute of material fact concerning whether it would be objectively unreasonable for an inspector to designate the houses immediately uninhabitable based on the record evidence of their conditions. Nevertheless, the inspectors would be immune from suit if the plaintiffs did not have a clearly established right to be free from eviction based

upon non-emergency code violations and without a hearing.  Our holding in *Flatford*, however, foreclosed that possibility.

In the underlying opinion that led to the *Flatford* appeal, the district court wrote:

[T]he building inspector could be expected to know that ordering tenants to vacate their apartment on two and one-half hours' notice could violate the tenants' constitutional rights.  The building inspector even took the city attorney with him to inspect the apartment.  Clearly, the person charged with the authority to put people out of their homes could be expected to be well-versed in the rights of those whom he evicts. . . .  Thus, the court finds that neither the building inspector nor the police officers are entitled to qualified immunity[.]

*Flatford v. City of Monroe*, 794 F. Supp. 227, 234 (E.D. Mich. 1992).  When we subsequently reversed the district court's immunity determination, we did not do so on the ground that the right was not clearly established, but rather, the "dispositive issue" was whether the inspector's "conclusion that an emergency situation existed was an objectively unreasonable decision[.]" *Flatford*, 17 F.3d at 167.  We explained:

The record clearly contains facts from which a reasonable building inspector could conclude that the occupants, and particularly the children, might be imminently endangered.  Even if in hindsight we conclude that [the inspector's] decision to evacuate was erroneous, the [tenants'] evidence fails to prove that a reasonable building inspector could not conclude that the condition of the wooden-framed structure posed an immediate threat to the safety of its occupants. We, therefore, hold that [the inspector] is entitled to qualified immunity for any failure to provide predeprivation process.

*Id.* at 168.  We noted that in 1972, "the Supreme Court held that due process requires notice and a hearing prior to eviction."  *Id.* at 167 (citing *Fuentes v. Shevin*, 407 U.S. 67 (1972)).  We concluded that the plaintiffs had "a clearly established right to a pre-eviction hearing . . . in the absence of exigent circumstances."  *Id.*  The inspectors here are neither immune from suit nor entitled to summary judgment on the pre-deprivation claims.

Each plaintiff also included the City as a defendant in their pre-deprivation due-process counts.  Their notice of issues on appeal arguably references the pre-deprivation claims,[7] and

_____

[7]The statement of issues frames the claims against the City as "whether the City of Lansing adopted and implemented a policy of using the police and code compliance and used a defective notice of correction process to deny its citizens due process."

plaintiffs' opening brief addresses municipal liability for the post-deprivation claims, but it lacks any discussion of why the City should be held liable on the pre-deprivation claims. We therefore deem those arguments abandoned.

## 2. Post-Deprivation

We next turn to the post-deprivation claims. All the plaintiffs received red tags but notice beyond that varied. Holsey and Louden testified that they did not receive any notice other than the red tag itself. Gardner affirmed that he received a correction notice, but not until several months after his home was red tagged. The record is not clear whether the Hudsons received anything beyond the red tag.

Notice beyond the red tags matters because, as we observed in the prior interlocutory appeal, "none of the red-tags provided any information regarding the occupant's right to appeal the inspector's decision and receive an administrative hearing." *Gardner v. Evans*, 811 F.3d 843, 845 (6th Cir. 2016). The tags simply stated:

> You must contact the undersigned, no later than seven days before the compliance due date, to set up an appointment to meet at the structure (to verify that all corrections have been completed) or to acquire an authorized extension. Before the re-inspection you must obtain all required permits and have those repairs inspected and approved by the appropriate inspector.

> All violations must be corrected with approved materials and methods. If you have any questions or concerns about complying within the time indicated, you may contact at (517) 483-4064 Monday through Thursday between the hours of 8–9 AM or 12–1 PM [Name of the officer to contact.]

*Id.* And as we explained:

> The red-tag notices failed to reveal that § 1460.12 of the Lansing Housing and Premises Code outlines a post-deprivation appeals process and directs that if an evicted occupant fails to file an appeal within twenty days after receiving a red-tag, the occupant waives the right to administrative review. Unaware of these requirements, none of the Tenants filed an appeal within the twenty-day period, and thus all of them inadvertently waived their right to an administrative review. Without recourse to any administrative remedy, the Tenants' sole option was to pursue a judicial remedy.

*Id.* at 846.  Plaintiffs claim that the City and the inspectors violated their due-process rights by failing to apprise them of their right to appeal.

Prior to the interlocutory appeal, the district court found that neither the City nor the inspectors were entitled to summary judgment on the post-deprivation due-process claims.  The court largely rested its conclusion on our decision in *Flatford* because, in the district court's view, the *Flatford* decision "clearly established . . . that a meaningful post-deprivation review process is constitutionally required, and that direct, personal notice of such a process to affected individuals is also required."  *Gardner I*, 2015 WL 403166, at *18.  The district court rejected the idea that the City's housing code itself constitutes adequate notice because "*Flatford* requires actual notice, not constructive notice[.]"  *Id.*  The district court also pointed out that the City's housing code requires notifying only the owner of a red-tagged home about the appeal process—not the tenants.  *Id.*

We distinguished *Flatford* on interlocutory appeal, and the case returned to the district court.  *See Gardner*, 811 F.3d at 847–48.  On remand, the district court reconsidered the post-deprivation notice and concluded that the City was entitled to summary judgment.  The district court reasoned that plaintiffs were given adequate notice because the red tags included a phone number to call with questions and information about the appeals process could be found online. *See Gardner v. Evans*, No. 1:12-cv-1338, 2017 WL 4512568, at *3 (W.D. Mich. Aug. 11, 2017) ("*Gardner II*").

There is no "all-embracing test for deciding due process claims."  *Dusenbery v. United States*, 534 U.S. 161, 168 (2002).  The Supreme Court has approved the use of the three-factor test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), as well as the "more straightforward test of reasonableness under the circumstances" articulated in *Mullane v. Central Hanover Bank & Trust Company*, 339 U.S. 306, 314 (1950).  *Id.*  *Eldridge* focused on the process used for discontinuing a person's Social Security disability benefits.  *Mullane*, on the other hand, focused on the adequacy of the government's notice of a cash forfeiture.  We believe *Mullane* provides the more fitting test in this case because plaintiffs do not challenge the adequacy of the post-deprivation proceedings, but only their notice of those proceedings.  *See id.* at 168 ("Since

*Mullane* was decided, we have regularly turned to it when confronted with questions regarding the adequacy of the method used to give notice.").

Under *Mullane*, we ask whether the notice was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314. The Court's opinion in *Mullane* further elaborated on how to undertake this inquiry:

> The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance. But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied. . . .
>
> [W]hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes.

*Id.* at 314–16 (internal citations omitted).

After our decision in *Flatford*, the Supreme Court reviewed the adequacy of post-deprivation notice in *City of West Covina v. Perkins*, 525 U.S. 234 (1999). There, police had seized the plaintiffs' personal property in the course of a valid search and though they left a notice of what they had seized, they did not provide information on the plaintiffs' remedies to recover the property. The Supreme Court held that the Fourth Amendment did not require the City to "take other steps" to inform the plaintiffs of their options because "[o]nce the property owner is informed that his property has been seized, he can turn to these public sources to learn about the remedial procedures available to him." 525 U.S. at 241.

Importantly, the Court in *West Covina* distinguished its holding from its prior decision in *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1 (1978). The Court explained that in *Memphis Light*, it had held that due process required a public electric utility to inform a customer "not only of the planned [service] termination, but also of the availability and general contours of

the internal administrative procedure for resolving the accounting dispute." *Id.* at 241–42 (citing *Memphis Light*, 436 U.S. at 13–15). But the Court explained that "[i]n requiring notice of the administrative procedures, however, we relied not on any general principle that the government must provide notice of the procedures for protecting one's property interests but on the fact that the administrative procedures at issue were not described in any publicly available document." *Id.* Rather, a customer's opportunity to invoke the remedial procedures depended on word-of-mouth referrals. *Id.*

Here, it is undisputed that details concerning the appeals process were available to the public on the City of Lansing's website. But that does not necessarily settle the matter. It is not a foregone conclusion that the mere posting of information on a city's website is a "reasonably calculated" way, under all the circumstances, to apprise persons evicted from their homes that they may appeal the red tagging.

To begin, evictions are a particularly significant deprivation, arguably more so than the temporary deprivation of certain pieces of property contemplated by the Supreme Court in *West Covina*. *See West Covina*, 525 U.S. at 236 (discussing the confiscation of photos, an address book, guns and ammunition, and $2,629 in cash). An eviction becomes all the more serious when, as here, a resident is evicted with no prior notice. *Cf. Grayden v. Rhodes*, 345 F.3d 1225, 1243 (11th Cir. 2003) (recognizing the exceptional difficulty in being evicted with 36-hours' notice). In the case of Keosha Louden, for instance, this meant immediately finding a place to sleep both for herself and for her five children. Those temporary lodgings may or may not have given them access to a computer or the internet. Compounding the difficulties, mail is not delivered to red-tagged homes. Thus, with no prior notice, the now-homeless plaintiffs had 20 days to learn that they *could* appeal this decision, as well as properly file their appeals.

The record does not reveal how, in 2012, a visitor to the website could discover the appeal information, but it was conceivably less than obvious. There is evidence in the record that the website, for more than a year, had out-of-date information regarding the applicable authority for issuing red tags. And it took the sustained efforts of the district court and the attorneys on both sides to simply track down the applicable ordinance language. As the district court put it, "the litigation history of this case demonstrates [that] finding the applicable City

ordinances—whether on paper or online—is going to take longer than the twenty days the ordinances apparently allow for appeal." *Gardner I*, 2015 WL 403166, at \*18; *see also Grayden*, 345 F.3d at 1243 (collecting Supreme Court cases in support of the idea that citizens require some amount of time to "educate themselves about the law before they can wield the rights dedicated to them under it"). In this way, the case is more like *Memphis Light* than *West Covina*.

Even so, the City points out that the red-tag notices provided the name and phone number of the inspector to call with questions. Thus, according to the City, if plaintiffs were curious about their options after the red tagging, all they needed to do was call the number. The district court made the same observation when it likened the case to our decision in *Silvernail v. County of Kent*, 385 F.3d 601 (6th Cir. 2004). *See Gardner II*, 2017 WL 4512568, at \*3. In *Silvernail*, we confronted notices issued to the writers of dishonored checks who faced the prospect of a $25 assessment fee. We employed the balancing test of *Eldridge* and concluded that providing a phone number that the recipient could call satisfied the requirements of due process because it was "reasonably calculated to inform" the recipients of the allegations against them and "provided a means for responding to the allegations." 384 F.3d at 604–05. The district court conceded that in this case the plaintiffs' interest in remaining in their homes "is greater than the private interest in *Silvernail*," but concluded that "the fundamental analysis is the same" because the red-tag notice "describes corrections needed for compliance" and "provides a number to call with 'questions or concerns about complying within the time indicated.'" *Gardner II*, 2017 WL 4512568, at \*3.

We agree that the red tags provided adequate notice to the homeowners but disagree as to the tenants and other occupants of the homes who were forced to immediately evacuate the homes due to the red taggings. An evicted tenant may appeal the red tagging of her home through the City's appeal process because she is "directly affected." *See* Housing Code § 1460.01(q). But the information about remedying violations and the contact information provided by the red tag would give her no indication of her opportunity to appeal. The information is exclusively oriented toward realizing repairs to the home, not contesting the red tagging decision in the first place. The inspector whose name and number are listed is the person

who will "verify that all corrections have been completed" and is specifically to be called regarding "questions or concerns *about complying within the time indicated*[.]" *Gardner*, 811 F.3d at 846 (emphasis added). An evicted tenant would have no reason to think calling the inspector would do her any good should she seek to appeal the red tagging decision on the basis of being an "affected person." And even if she did call the number, the record reveals that the inspector might be of little help. Inspector Scott Sanford—whose name appeared on the notice attached to Louden's home—testified, "I don't know what the legal rights of a tenant would be as far as, you know, appealing something that he doesn't own to the City. So you would have to talk to the city attorney's office about that."

On balance, a jury could find that the City's mere reliance on its website and the limited language of the red tag notices was not reasonably calculated to notify evicted tenants of their right to appeal and their 20-day window to do so. We therefore reject the district court's basis for granting summary judgment to the City and the inspectors on the post-deprivation notice claims. Whether those defendants can be held liable under § 1983 is another question.

"A municipality is a 'person' under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible." *Morgan v. Fairfield Cty.*, 903 F.3d 553, 565 (6th Cir. 2018) (citing *Monell v. Dep't of Soc. Svs.*, 436 U.S. 658, 690 (1978)). "The scope of that responsibility does not include *respondeat superior* liability," so one route for holding municipalities liable—and the one Plaintiffs argue for—is showing that the harms at issue were "caused by the implementation of municipal policies or customs[.]" *Id.* (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)).

There is no dispute that it was the City's policy to simply provide the type of notices that plaintiffs received. The City's ordinance requires only that "the owner or the person or persons responsible for the structure" be given the notice of correction that accompanies red tagging. *See* Housing Code § 1460.09(c). As the district court observed prior to the interlocutory appeal, "the undisputed record reflects that the City of Lansing has a policy and practice of providing inadequate post-deprivation process to individuals whose homes are red-tagged—not only the Plaintiffs in this case, but all such individuals." *Gardner I*, 2015 WL 403166, at *19. A reasonable jury could find that the harms at issue were caused by the lack of notice. All of the

tenant plaintiffs were displaced from their homes due to the red tagging and none appealed the decision. Thus, consistent with the district court's initial conclusion, we likewise conclude that the City is not entitled to summary judgment on the post-deprivation claims.

This still leaves the claims against the inspectors themselves, which we partially addressed in the prior interlocutory appeal. Consistent with our prior decision, the defendant inspectors are immune from Counts 3 (against Brand), 3 and 18 (against Sanford), and 24 (against Scrimger) insofar as those counts allege that the inspectors violated plaintiffs' due-process rights by failing to include in the red-tag notices "an explicit reference to the availability of any post-deprivation appeals process and the manner in [which] such an appeal may be pursued." *Gardner*, 811 F.3d at 848. The inspectors contend that this ends the matter, but plaintiffs counter that they still have a viable claim. Plaintiffs argue that the inspectors failed to give them reasonable notice at any point, apart from the allegedly deficient red tags discussed in the first appeal.

As an initial matter, we agree with plaintiffs that this theory of liability was neither waived nor forfeited for failure to articulate it while opposing defendants' motion for summary judgment. The district court duly exercised its discretion to not reopen the pleadings or permit additional discovery in aid of plaintiffs advancing the theory. But that does not mean plaintiffs may not pursue it. The operative complaint encompassed this theory of liability by stating that the defendant inspectors did not provide the plaintiffs "with post-deprivation notice of their right to appeal the order to vacate their residence to the Board of Appeals" or "their right to challenge the Board of Appeals decision to a court of competent jurisdiction." Our focus is now on whether the universe of record evidence before us could support the necessary factual findings to prevail on that theory. And our holding in the prior appeal was narrow. We reversed the decision of the district court because *Flatford* did not "clearly establish[] that a *notice of eviction* must include a direct explanation of the post-deprivation appeals process." *Gardner*, 811 F.3d at 845 (emphasis added). The issue is properly before us.

Even so, we conclude that the inspectors are immune from suit on the entirety of the due-process counts against them. Plaintiffs insist that *Flatford* clearly established their right to receive notice, at some point, about their right to appeal. We agree that plaintiffs had a clearly

established right to receive notice of their right to appeal, but they did not have the right to receive it *from the inspectors* who red tagged their homes. In *Flatford*, we explained that the actions of City's Director of Building and Safety were objectively unreasonable because "despite actual knowledge of the [tenants'] possessory interests, [the director] took no action on their behalf. It is too plain for argument that the [tenants], who were barred from entering their home, have at least a clearly-established right to process of the sort that [the director] afforded to their landlord." *Flatford*, 17 F.3d at 169. We immediately distinguished our holding, however, from a similar case in the Seventh Circuit:

> The Seventh Circuit reached a different conclusion in *McGee v. Bauer*, 956 F.2d 730 (7th Cir.1992), where a homeowner was dispossessed of his home under perceived exigent circumstances. Although troubled by the building inspector's failure to advise the plaintiff of his right to a hearing, the court reasoned that the inspector's omission was not unreasonable since it was not his but a city attorney's duty to advise the plaintiff of his legal rights. This case, however, is distinguishable by the fact that [the director] is not merely a building inspector but the highest official of the City's Building Safety Department, vested with the statutory duties of commencing proceedings against those responsible for dangerous structures.

*Id.* at 169 n.7. Here, plaintiffs have sued the individual inspectors who red tagged their homes, not any other, higher-up officials. In that respect, the case is more akin to the Seventh Circuit's decision in *McGee* and less like our own decision in *Flatford*. Summary judgment for the inspectors on the post-deprivation claims was therefore appropriate.

## F. False Arrest and Malicious Prosecution

William Gardner and the plaintiffs who were arrested at the Karen Street house accused the defendant police officers of violating the Fourth Amendment through false arrests and malicious prosecutions, and also brought a state-law count for false arrest. The district court granted summary judgment on all these counts. Only Gardner appeals the court's decision on his claims, which he brought solely against Officer Evans.

Gardner appears to have been detained twice. He was first detained and possibly arrested on December 9, 2009, the day his home was searched. He was then later arrested on August 3, 2010 on charges stemming from evidence found during the December search. Gardner's false-

arrest and malicious-prosecution claims against Evans in the amended complaint focus on the 2010 arrest. The amended complaint asserts that Evans "caused the arrest of Plaintiff William Gardner by swearing to a felony complaint and arrest warrant . . . ." The complaint, however, is not record evidence, and Evans testified that although the "prosecuting attorney warrant request form" seeking Gardner's prosecution bore his badge number, he was not the one to "fill out the warrant request."

In some circumstances, liability can attach to non-arresting officers, but the inquiry still turns on probable cause for the arrest itself. *See Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) ("A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff."); *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. Ct. App. 2003) ("To prevail on a claim of false arrest . . . a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause."). The evidence clearly establishes that by May 5, 2010, when the arrest warrant request was sworn out, there was probable cause to arrest Gardner. Pursuant to a valid search warrant executed on December 9, 2009, police officers had discovered crack cocaine and trafficking-related paraphernalia in Gardner's home. The district court properly granted summary judgment to Evans on the false-arrest counts.

The probable cause for the arrest and Evans's detachment from it also doom Gardner's malicious prosecution claim. A Fourth Amendment claim of malicious prosecution requires, among other things, proof that "the defendant made, influenced, or participated in the decision to prosecute the plaintiff[.]" *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (citing *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010)). "To be liable for 'participating' in the decision to prosecute the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Id.* at 660 (quoting *Sykes*, 625 F.3d at 308 n.5). Such a claim also requires that the plaintiff "show that there was a lack of probable cause for the criminal prosecution." *Sykes*, 625 F.3d at 308. There is no evidence that Evans participated in the prosecution of Gardner after his possible involvement in creating the May 5, 2010 arrest warrant. Further, that arrest warrant was based upon probable cause. The district court properly granted summary judgment to Evans on the malicious prosecution count.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED IN PART and REVERSED IN PART. Specifically, we affirm judgment in favor of the defendants on all counts concerning the invalidity of the search warrants (Counts 1, 21, and 27 of the first amended complaint; Count 1 of the Holsey complaint), all counts concerning the execution of the search warrants (Counts 2, 17, and 23; Count 2 of Holsey), all of the invasion-of-privacy counts (Counts 4, 19, and 25; Count 4 of Holsey), and all counts concerning false arrest and malicious prosecution (Counts 6–8). On the due-process claims, we reverse entirely the judgment against Louden (Count 18), Roosevelt and Javon Hudson (Count 24), and Holsey (Holsey Count 3), and we reverse the judgment against Gardner (Count 3) and James Hudson (Count 24) as to the pre-deprivation claims of those counts, but affirm the judgment against them as to the post-deprivation claims within those counts because they are homeowners. We reverse the judgment in favor of defendants on all remaining counts that are part of this appeal (Counts 5 (of both complaints), 6 (of Holsey), 10, 20, 22, 26, 31, and 32). The case is remanded to the district court for further proceedings consistent with this opinion.