OPINION
COLE, Circuit Judge.
This is a civil rights case brought under 42 U.S.C. § 1983. Plaintiff-Appellee Shelley Evans-Marshall, a public high school teacher, filed a complaint against Defendants-Appellants, the Board of Education of Tipp City Exempted Village School District; John T. Zigler, the Superintendent of the Tipp City Schools; and Charles W. Wray, the principal of Tippecanoe High School, a high school in the Tipp City school district. Evans-Marshall argues that Zigler and Wray, in recommending the non-renewal of her teaching contract, retaliated against her for exercising her rights under the First Amendment. The Defendants-Appellants filed a motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Upon denial of the motion, the Defendants-Appellants have lodged this interlocutory appeal. For the following reasons, this Court AFFIRMS the judgment of the district court.
I. Factual Allegations and Background
According to the allegations of the Complaint, Shelley Evans-Marshall is a certified high school teacher and a former employee of the Board of Education of Tipp City Exempted Village School District (the “Board”), located near Dayton, Ohio. Evans-Marshall was hired by the Board to teach language arts to high school students at Tippecanoe High School, and to advise the high school literary magazine for the 2000-2001 school year. During her employment, Evans-Marshall’s direct supervisor was the principal of Tippecanoe High School, Charles W. Wray.
Throughout the 2000-2001 school year, Evans-Marshall received periodic evaluations from Wray. On January 4, 2001, her evaluation had six ratings of outstanding, fifteen ratings of satisfactory, and no unsatisfactory ratings. On April 10, 2001, she received five ratings of outstanding, sixteen ratings of satisfactory, and no unsatisfactory, ratings. At the end of the school year, Evans-Marshall’s teaching and literary magazine contracts were renewed.
On October 22, 2001, approximately twenty-five parents attended a public meeting of the Board of Education of the Tipp City Schools to “express concerns about the appropriateness and merit of some materials that had been assigned to the students as optional reading.” The next day, Wray told Evans-Marshall, in front of the school’s English teachers, that she was on the “hot-seat” because parents complained at the Board meeting about Evans-Marshall’s assignment of the book Siddhartho, to her students. Shortly thereafter, Evans-Marshall was evaluated for the first time for the 2001-2002 school year, and received no negative comments.
At the next Board meeting, held on November 26, 2001, public criticism of Evans-Marshall intensified. According to the *227 Complaint, “approximately 100 parents were in attendance to protest the presence of material in classes and school libraries that the parents thought obscene.” A petition was also presented with about 500 signatures that called for “decency in education.” According to Evans-Marshall, the focus of the parents’ concern was the subject matter presented in her classes.
Several weeks after the November 26 meeting, Wray formally observed Evans-Marshall in her classroom. Following the observation, Wray, for the first time, gave Evans-Marshall negative comments concerning her performance. He also provided her with instructions: “Any material containing graphic violence, sexual themes, profanity, suicide, drugs and alcohol need [sic] to be discussed with your department chairs before being used in class.” Evans-Marshall responded to the instruction in writing. She noted that the materials used in her class were the novels Fahrenheit 451, To Kill a Mockingbird, and Siddhartha, that none of these books had any inappropriate themes, and that each book “had been purchased and approved by the Board.” '*
Evans-Marshall’s first written evaluation following the November 26 meeting was notably more critical than previous evaluations. On January 10, 2002, Wray rated Evans-Marshall as “unsatisfactory on 4 criteria, outstanding on only 2 criteria, and satisfactory on 15 performance criteria.” Wray further commented that “Use of material that is pushing the limits of community standards through graphic violence and sexual overtones has created a negative image in the community .... Continued to use or tried to use material that was questionable after being told to get such material reviewed by department chairpersons or the principal.”
On March 11, 2002, Evans-Marshall showed her class Romeo + Juliet, a movie adaptation of the Shakespeare play. Wray observed the class again and asked Evans-Marshall about the rating of the movie. Evans-Marshall informed him that it was rated PG-13. According to the Complaint, prior approval is not required to show movies rated PG-13.
•On March 21, 2002, Evans-Marshall received her second written evaluation since the November 26 meeting; it was also very critical. Evans-Marshall “received 5 ratings of unsatisfactory, one rating of outstanding, and 15 ratings of satisfactory.” Wray made the following comment in writing: “The evaluation from the first part of the year addressed several areas of concern that has [sic] arisen this year. There have been improvements but not enough to recommend a continuing contract.”
Superintendent Zigler recommended the non-renewal of Evans-Marshall’s contract at the Board’s meeting on March 25, 2003. In accordance with Zigler’s recommendation, the Board unanimously passed a motion not to renew Evans-Marshall’s contract, and hired a replacement teacher. Evans-Marshall made various attempts to challenge the dismissal, all of which were denied by the Board.
Evans-Marshall brought suit in federal court under 42 U.S.C. § 1983, seeking in-junctive relief and damages. She alleges that she was terminated in “retaliation for the curricular and pedagogical choices she made while teaching at Tippecanoe High School and the exercise of rights under the First Amendment.” Evans-Marshall seeks recovery against the Board, as well as Wray and Zigler.
The Defendants-Appellants moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court denied the motion; this timely appeal ensued.
*228 II. Analysis of Retaliation Claim
A. Standard of Review and Elements of Retaliation
On a Rule 12(b)(6) motion, we construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the pleader. Rossborough Mfg. Co. v. Trimble, 301 F.3d 482, 489 (6th Cir.2002); Hardy v. Jefferson Cmty. Coll., 260 F.3d 671, 677 (6th Cir.2001); see also Charles Alan Wright & Arthur R. Miller, 5B Federal Practice And Procedure § 1357 at 417 (3d ed.2004). Claims under 42 U.S.C. § 1983 “are not subject to heightened pleading standards.” Memphis, Tenn., Area Local, Am. Postal Workers Union, AFL/CIO v. City of Memphis, 361 F.3d 898, 902 (6th Cir.2004). Therefore, “[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.” Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). “If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding.” Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Claims lacking factual merit are properly dealt with through summary judgment under Rule 56. Id. This is because, under the notice pleading standard of the Federal Rules, courts are reluctant to dismiss colorable claims which have not had the benefit of factual discovery. See Conley v. Gibson, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (“The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.”). A motion to dismiss “should not be granted ‘unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.’ ” Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir.1976) (citing Conley, 355 U.S. at 45-46, 78 S.Ct. 99).
In this case, Evans-Marshall claims she was terminated due to activities protected under the First Amendment. Accordingly, she must allege the following elements in order to establish a constitutionally protected right for the purposes of qualified immunity:
(1) that [she] was engaged in a constitutionally protected activity; (2) that the defendant’s adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights.
Cockrel v. Shelby County Sch. Dist., 270 F.3d 1036, 1048 (6th Cir.2001). If these elements are satisfied, the defendants may rebut the claim by establishing^ by a preponderance of the evidence, that “they would have taken the same action even in the absence of the protected conduct.” Id. (internal quotes and citation omitted).
B. Whether the Activity Was Constitutionally Protected
In considering the first element of First Amendment retaliation — whether a state-employed teacher’s in-class speech is constitutionally protected by the First Amendment — this Court has consistently applied the balancing test announced in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and refined in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). See Cockrel, 270 F.3d at 1055 n. 7 (citing cases); Hardy, 260 F.3d at 678; Bonnell v. *229 Lorenzo, 241 F.3d 800, 811-12 (6th Cir.2000); Dambrot v. Cent. Mich. Univ., 55 F.3d 1177, 1185 (6th Cir.1995).
Under that familiar test, we first determine whether Evans-Marshall’s activity constitutes “speech” within the meaning of the First Amendment. See Cockrel, 270 F.3d at 1048. If Evans-Marshall’s activity was “speech,” she must show: (1) that she “was disciplined for speech that was directed toward an issue of public concern”; and (2) that her “interest in speaking as [she] did outweighed the [school’s] interest in regulating [her] speech.” Hardy, 260 F.3d at 678 (citing Pickering, 391 U.S. at 574, 88 S.Ct. 1731); Cockrel, 270 F.3d at 1050 (same). In determining whether speech is on a matter of public concern, we look to the “content, form, and context of a given statement, as revealed by the whole record.” Hardy, 260 F.3d at 678 (citing Connick, 461 U.S. at 147-48, 103 S.Ct. 1684). As to the content of the speech, “so long as the speech relates to matters of ‘political, social, or other concern to the community,’ as opposed to matters ‘only of personal interest,’ it shall be considered as touching upon matters of public concern.” Cockrel, 270 F.3d at 1052 (citing Connick, 461 U.S. at 146-49, 103 S.Ct. 1684).
The concurrence would reexamine our application of Pickering to in-class curricular speech because “[t]he Supreme Court has never held that the First Amendment applies to a teacher’s classroom speech, and there is good reason to think it would not do so.” Cone. ¶ 6. Of greater relevance is that the Supreme Court has never removed in-class speech from its presumptive place within the ambit of the First Amendment. See Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 415-16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (“The First Amendment forbids abridgment of the ‘freedom of speech.’ Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.”) (emphasis added).
Moreover, the Supreme Court has characterized the proposition that “students and teachers do not shed their constitutional rights to freedom of speech and expression at the schoolhouse gate” as “the unmistakable holding of [the] Court for almost 50 years.” Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). See also Pickering, 391 U.S. at 568, 88 S.Ct. 1731 (“[T]eachers may [not] constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest.”); Keyishian v. Bd. of Regents, 385 U.S. 589, 605-06, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (“[T]he theory that public employment ... may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.”). The assumption that the Court would draw a distinction between the schoolhouse gate and the doors of the classroom is countérintuitive. See id. at 683 (“The classroom is peculiarly the ‘marketplace of ideas.’ ”); Hardy, 260 F.3d at 671 (“In light of [Supreme Court] precedent, the argument that teachers have no First Amendment rights when teaching, or that the government can censor teacher speech without restriction, is totally unpersuasive.”).
In any event, applying Pickering pursuant to Cockrel, the district court held that dismissal of the individual defendants was inappropriate:
[T]aking the facts in Plaintiffs Complaint as true and giving her the benefit of every reasonable inference to be *230 drawn therefrom, it is clear that her assignment of certain books to her students constitutes speech, that the Complaint does not, upon its face, sufficiently detail the subject matter of the allegedly offensive books sufficiently to allow this Court to determine whether they touch upon matters of public concern and, further, that this Court cannot undertake the balancing test required by [Pickering] based upon the Complaint alone. Moreover, a reasonable inference to be drawn as pled by the Plaintiff,' if accepted by the trier of fact, may lead it to conclude that the decision to terminate her was based, at least in part, upon her decision to assign the books in question.
Dist. Ct. Dec. at 2. We conclude that this decision was not in error.

1. Teaching as Speech

As an initial matter, the activity at issue is “speech” for the purposes of the First Amendment. In this case, the disputed materials — three well-respected novels and a movie adaptation of a Shakespeare play — are clearly protected by the First Amendment. See Metzger v. Peracy, 393 F.2d 202, 204 (7th Cir.1968) (“Motion pictures, like books, are protected by the constitutional guarantees of freedom of speech and press.”). Furthermore, our precedent establishes that the assignment by a public school teacher of protected materials is itself “speech” within the meaning of the First Amendment. See Cockrel, 270 F.3d at 1049 (holding a teacher’s sponsorship of an in-class speaker on industrial hemp was speech, despite the lack of a “particularized message” such as “advocating or speaking against hemp’s usé as an environmental alternative to cutting down trees”); Stachura v. Truszkowski, 763 F.2d 211, 214-15 (6th Cir.1985) (holding that a teacher’s in-class use of movies on sexual maturity is protected by the First Amendment), rev’d on other grounds by Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 304-05, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986).
Relying on Fowler v. Board of Education, 819 F.2d 657 (6th Cir.1987) (single-judge opinion), the individual defendants argue that the assignment of the disputed materials is not “speech” and that the allegations of the Complaint do not establish an advocative or expressive purpose in the assignment of the various literary works. Id. at 662-64 (Milburn J., concurring) (holding that the in-class showing of a movie on a non-instructional day was not speech since the teacher conceded she had no curricular, communicative, or expressive intent). However, as we have recently noted, Fowler is a single-judge opinion and as such not binding on this Court. See Cockrel, 270 F.3d at 1049-50. Furthermore, the two remaining judges on the Fowler Court concluded that the showing of the movie was speech for the purposes of the First Amendment. See id. (citing Fowler, 819 F.2d at 667, 669-70).

2. A Matter of Public Concern

Having determined that the Complaint alleges activity sufficient to be considered “speech,” Evans-Marshall must now establish by allegation that the speech is constitutionally protected. To do this, Evans-Marshall must allege sufficiently that her speech “touched on a matter of public concern.” Cockrel, 270 F.3d at 1050.
In the Complaint, Evans-Marshall contends that her termination “was retaliation for the curricular and pedagogical choices she made while teaching at Tippecanoe High School and the exercise of rights under the First Amendment.” Evans-Marshall specifies that she assigned the books Siddhartha, Fahrenheit 451, and To Kill a Mockingbird, and the movie Romeo + Juliet, to an upper-level high school *231 language art class'. Under Rule 12(b)(6), we must resolve all reasonable inferences in favor of the plaintiff. Rossborough Mfg. Co., 301 F.3d at 489. We draw the reasonable inference that Evans-Marshall taught the main themes of the work she assigned. For instance, in teaching To Kill a Mockingbird, it is reasonable to- infer that Evans-Marshall taught the themes of race and justice in the American South. Such content is clearly a matter of public concern. See Cockrel, 270 F.3d at 1052; Hardy, 260 F.3d at 679 (noting that “race, gender, and power conflicts in our society” are “matters of overwhelming public concern”). The same can be said of the other disputed works: spirituality (Siddharbha), the intersection of love and politics, (Romeo + Juliet), and, of course, government censorship of books (Fahrenheit 451).

8. The Balancing Test

Having established that Evans-Marshall’s speech was of public concern, we now balance the speech against the interests of the Board. The individual defendants identify a host of factors that support “the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.” Pickering, 391 U.S. at 568, 88 S.Ct. 1731. The individual defendants argue that Evans-Marshall was terminated for insubordination, lack of communication, and lack of teamwork, and not for her First Amendment activity. The individual defendants then note that the Board has a statutory duty to control the curricular and pedagogical choices of its teachers. See Ohio Rev. C. § 3313.60(A) (2005) (“The board of education of each city and exempted village school district ... shall prescribe a curriculum for all schools under their control.”). Finally, the individual defendants note that the Board may limit curricular speech with which it does not agree. See Hazelwood Sch. Dist. v. Kuhl-meier, 484 U.S. 260, 272-73, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (holding that student speech in a school newspaper is subject to reasonable regulations by principal).
The individual defendants have not shown that the allegations and reasonable inferences therefrom fail to establish “any set of facts that could be proved consistent with the allegations.” Hishon, 467 U.S. at 73, 104 S.Ct. 2229. The claim that Evans-Marshall’s termination was for non-retaliatory reasons cannot be considered without some factual discovery. On a motion to dismiss, we are required to assume the plaintiffs factual allegations to be true. See Rossborough Mfg. Co., 301 F.3d at 489. Here, Evans-Marshall alleges that the Board’s reasons for termination were merely a pretext for retaliation. This is supported by factual allegations that Evans-Marshall received negative job evaluations due to criticism from the community related to the alleged speech, and not due to her employment performance. Such allegations are sufficient to survive a motion to dismiss.
Regarding control of the curriculum and disassociation with objectionable speech, our precedent is instructive. We have previously concluded that the prior approval of controversial speech by the school or the Board undercuts the interests of the state in controlling the workplace. See Cockrel, 270 F.3d at 1054-55 (“[W]e cannot allow [concerns of harmony, efficiency, and discipline] to tilt the Pickering scale in favor of the government ... when the disruptive consequences of the employee speech can be traced back to the government’s express decision permitting the employee to engage in that speech.”); see also Stachura, 763 F.2d at 214-15.
Evans-Marshall alleges that the three novels “had been purchased and approved *232 by the Board.” Furthermore, the movie used in class was rated PG-13, and according to Evans-Marshall, could be shown without prior approval. Nonetheless, after a public outcry related to the use of the disputed materials, Evans-Marshall alleges that she was criticized publicly by Wray, received negative evaluations for the first time, and was eventually terminated. Such allegations are sufficient to establish protected First Amendment activity under the Pickering test, at least for the purposes of a motion to dismiss.
C. The Remaining Elements of Retaliation
Evans-Marshall’s allegations also satisfy the remaining elements of a First Amendment retaliation claim. Specifically, non-renewal is “an injury that would likely chill a person of ordinary firmness from continuing in [the] activity.” Cockrel, 270 F.3d at 1048, 1055. As noted above, Evans-Marshall adequately alleges that her non-renewal “was motivated at least in part as a response to the exercise of her free speech rights.” Id. at 1055.
As to the rebuttal of the individual defendants, our inquiry is again limited by the early stage of this case. Assuming, as we must, that the allegations of the Complaint are true, and without the benefit of factual discovery, the individual defendants cannot show that “they would have taken the same action even in the absence of the protected conduct.” Id. at 1048. Indeed, Evans-Marshall alleges that the public outcry related to her protected First Amendment activity was the motivating factor behind her termination.
III. Analysis of Qualified Immunity
The individual defendants also raise a qualified immunity defense as a basis for their Rule 12(b)(6) motion. We engage in a two-step process for determining whether a state actor is entitled to qualified immunity. First, whether “[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the officerfs’] conduct violated a constitutional right.” Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, “if a violation could be made out on a favorable view of the parties’ submissions, the next, sequential step is to ask whether the right was clearly established.” Id. We review de novo the question of qualified immunity on a motion to dismiss. Hardy, 260 F.3d at 677.
Evans-Marshall has made allegations sufficient to satisfy the first prong of qualified immunity, that “the officers’] conduct violated a constitutional right[.]” Saucier v. Katz, 533 U.S. at 201, 121 S.Ct. 2151. Since the Complaint adequately alleges a claim of First Amendment retaliation, there are sufficient allegations to support a claim that the individual defendants violated Evans-Marshall’s constitutional rights by terminating her. See Hardy, 260 F.3d at 682 (noting that first prong of qualified immunity is met when First Amendment retaliation is adequately alleged).
Evans-Marshall’s claim also satisfies the second prong of qualified immunity, that “the right was clearly established.” Saucier, 533 U.S. at 201, 121 S.Ct. 2151. Under a liberal reading of the Complaint, Evans-Marshall was terminated due to a public outcry engendered by the assignment of protected material that had been approved by the Board. Such a claim dovetails with previous, meritorious claims in this circuit. See Cockrel, 270 F.3d at 1054-55; Stachura, 763 F.2d at 214-15.
The dissent calls our attention to the comments by several of our sister circuits to the effect that constitutional rights discovered only pursuant to a balancing of *233 interests have special implications for qualified immunity. The First Circuit, for instance, has expressed concern that “when the law requires a balancing of competing interests, it may be unfair to charge an official with knowledge of the law in the absence of a previously decided case with clearly analogous facts.” Borucki v. Ryan, 827 F.2d 836, 848 (1st Cir.1987); see also Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir.1987) (holding that a right subject to a balancing test “can rarely be considered ‘clearly established,’ at least in the absence of closely corresponding factual and legal precedent”).
Yet Cockrel is clearly analogous to the facts at bar. In Cockrel, a teacher was fired because of a public outcry over material she presented in class that had been approved by the school. 270 F.3d at 1045. We held that her presentation of material in class constituted speech that dealt with a matter of public interest. Id. at 1053. We assumed that the concerns of the school did not outweigh Cockrel’s interest in speaking because the school had approved the very material that gave rise to the disruption. Id. at 1054-55. Even were this circuit to adopt the reasoning of some of our sister circuits, surely the fact that Evans-Marshall assigned books, whereas Cockrel brought in a guest lecturer about industrial hemp, does not obscure the constitutional right at issue.
IV. The Municipal Defendant
The Board also appeals the district court’s denial of the motion to dismiss. However, an exercise of jurisdiction over a municipal defendant after the denial of a motion to dismiss is ordinarily improper. Under the collateral order doctrine, “an order rejecting the defense of qualified immunity at either the dismissal stage or the summary judgment stage is a ‘final’ judgment subject to immediate appeal.” Behrens v. Pelletier, 516 U.S. 299, 307, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (“[W]e hold that a district court’s denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable ‘final decision’ within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.”). Qualified immunity only extends to “government officials per-r forming discretionary functions.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Barrett v. Steubenville City Sch., 388 F.3d 967, 970 (6th Cir.2004). Accordingly, the district court’s denial of the motion to dismiss is an appealable final order as applied to the individual defendants — Wray and Zigler— but not the municipal defendant — the Board.
In any event, the district court’s denial of the motion to dismiss the Board was not in error. As noted above, the allegations of the Complaint and the reasonable inferences therefrom are sufficient to support that Evans-Marshall engaged in constitutionally protected activity. The Board’s approval of Evans-Marshall’s termination is an injury that would chill First Amendment expression. Evans-Marshall also specifically alleges that the Board’s decision was at least partly motivated by the protected activity. As with the individual defendants, the Board’s rebuttal that the termination was for legitimate, non-discriminatory reasons cannot be considered without some factual discovery.
V. Conclusion
For these reasons, this Court AFFIRMS the judgment of the district court.