RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0141p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

BELINDA MARIE FITZPATRICK,

                                      *Plaintiff-Appellee*,

     *v.*

KYLE HANNEY, et al.,

                                    *Defendants*,

MATTHEW SIMON,

                                  *Defendant-Appellant*.

> No. 24-1639

_____

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:23-cv-01125—Jane M. Beckering, District Judge.

Argued: March 18, 2025

Decided and Filed: May 30, 2025

Before: BATCHELDER, LARSEN, and RITZ, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Kali M. L. Henderson, SEWARD HENDERSON PLLC, Royal Oak, Michigan, for Appellant. J. Nicholas Bostic, Lansing, Michigan, for Appellee. **ON BRIEF:** T. Joseph Seward, David D. Burress, SEWARD HENDERSON PLLC, Royal Oak, Michigan, for Appellant. J. Nicholas Bostic, Lansing, Michigan, for Appellee.

     BATCHELDER, J., delivered the opinion of the court in which LARSEN, J., concurred, and RITZ, J. concurred in Section III.A. RITZ, J. (pp. 10–17), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

ALICE M. BATCHELDER, Circuit Judge. In this interlocutory appeal, Matthew Simon, a local housing-code official, argues that qualified immunity shields him from suit on Belinda Fitzpatrick's claims under the Fourth and Fourteenth Amendments. The district court denied Simon's motion to dismiss after it determined that, based on the facts alleged, Simon had plausibly violated Fitzpatrick's clearly established constitutional rights. For the reasons below, we reverse.

**I.**

Belinda Fitzpatrick owns two adjacent homes in Lansing, Michigan, which is located in Ingham County. Sometime in September 2021, Ingham County Animal Control received a complaint that Fitzpatrick had "up to 30 chickens being harbored" in these two adjacent homes, and that she had been subjecting the chickens to "unsanitary living conditions." So, given these allegations, Animal Control dispatched Officer Kyle Hanney to speak with Fitzpatrick and investigate the claims against her.

After Officer Hanney and Fitzpatrick spent several minutes discussing her chickens, Fitzpatrick agreed to let Officer Hanney look inside one of her houses. But Fitzpatrick asked Officer Hanney "not to call Lansing City Code Compliance" about anything he saw because she was afraid that both houses "would be condemned" if a city official saw "the inside living conditions." Officer Hanney then entered one of Fitzpatrick's houses and immediately encountered a "very strong odor of ammonia" that made it "difficult [for him] to breath[e]." Not only that, but Officer Hanney also observed that the house was "extremely cluttered with personal belongings that were coated in what appeared to be chicken feces." In fact, the house contained so much chicken feces that Officer Hanney could not move around the house without walking through the feces. Outside the home, Officer Hanney observed chickens running around the backyard of Fitzpatrick's other property in seemingly hazardous conditions.

Based on what he saw, Officer Hanney successfully requested and obtained a warrant to search both of Fitzpatrick's homes for evidence of "crimes of animal neglect and cruelty," including "[a]ny and all living or deceased animals" and "[a]ny and all animals subjected to unsanitary/unsafe living conditions." But before returning to Fitzpatrick's homes with the warrant, Officer Hanney reached out to Matthew Simon, a local housing-code official, and invited Simon to join him and his team in their search of the homes. Simon agreed to do so, and after visiting Fitzpatrick's two homes and seeing their condition, he concluded that both were "unfit for human occupancy" and immediately placed a "red tag" on each one. These red tags prohibited Fitzpatrick (or anyone else) from entering the homes until they had been thoroughly cleaned.

Two years later, Fitzpatrick sued Officer Hanney, Simon, and the City of Lansing, alleging that they had each violated her constitutional rights under the Fourth Amendment, and that Simon and the City had each also violated her rights under the Fourteenth Amendment. Simon then moved to dismiss based on qualified immunity. The district court denied Simon's motion to dismiss after it concluded that, based on the facts alleged, Simon had plausibly violated Fitzpatrick's clearly established constitutional rights. This interlocutory appeal followed.

## II.

Qualified immunity shields government officials from suit unless those officials (1) violated a constitutional right that (2) was clearly established when the conduct occurred. *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022). Proving that a constitutional right is clearly established is no easy task, however, and doing so requires a plaintiff to show that two things are true. First, the rule establishing the right must be "settled," meaning that it is "dictated by controlling authority" and not merely "suggested by then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). And second, the rule must "clearly prohibit the [official's] conduct in the particular circumstances before him." *Id.* It is not enough, in other words, for the plaintiff to identify a case that "merely stand[s] for [a] general proposition." *Bell*, 37 F.4th at 367. Read together, these two principles require that the precedent be "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks

to apply." *Wesby*, 583 U.S. at 63.  In deciding qualified immunity defenses, we can address these two prongs in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

**III.**

Here, Fitzpatrick maintains that Simon violated her clearly established constitutional rights under the Fourth and Fourteenth Amendments when he searched her two homes for housing-code violations without a warrant for those violations and then proceeded to evict her from both homes without notice.  We disagree and address each issue in turn.

**A.**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches."  U.S. Const. amend. IV.  At its core, this guarantee means that unless an exception applies, a government search will be unreasonable under the Fourth Amendment if the government does not have a valid search warrant.  *See, e.g.*, *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002).  While this principle most often applies to searches conducted by police officers, it also applies to government officials who perform administrative searches for housing-code violations.  *Hill v. Whitford*, No. 20-2076, 2021 WL 3661325, at *2 (6th Cir. Aug. 18, 2021); *see also City of Los Angeles v. Patel*, 576 U.S. 409, 419-20 (2015).

Relying on these principles, Fitzpatrick argues here that Simon violated her clearly established rights under the Fourth Amendment when he searched her home without a separate warrant for housing-code violations.  Although Fitzpatrick concedes, as she must, that Officer Hanney received a valid warrant to search her home for evidence of animal neglect, she maintains that this warrant did not extend to Simon—a government official from a different agency searching her home for different violations.  We disagree.

This court has never held that the Fourth Amendment categorically prohibits joint searches between two government officials when both officials rely on the same search warrant.  To the contrary, in *United States v. Garcia*, we summarized decades of precedent and concluded that the Fourth Amendment allows such searches unless (1) the second official "had probable

cause to obtain a separate warrant," (2) the second official "had an opportunity but failed to obtain a separate warrant," and (3) the second official "was searching for items different from those authorized" by the first official's warrant. 496 F.3d 495, 509 (6th Cir. 2007). These three conditions are in the conjunctive.

And *Garcia* remains the rule today. Indeed, several years ago, this court reaffirmed *Garcia* and held that federal law enforcement officers in Michigan could rely on a search warrant issued to state law enforcement officers in Texas "so long as they [were] searching for the same evidence as the state officers and the same evidence authorized by the state warrant." *United States v. Castro*, 881 F.3d 961, 967 (6th Cir. 2018).

To be sure, this court has not yet decided whether the Fourth Amendment allows government officials such as Simon to search a home using a warrant obtained by a different official when both officials are looking for the same conditions, as opposed to items or evidence. But given the decisions that we do have, we conclude that Simon is entitled to qualified immunity on Fitzpatrick's Fourth Amendment claims because it was not clearly established then (or now) that Simon was "searching for items different from those authorized" by Officer Hanney's warrant. *Garcia*, 496 F.3d at 509. In other words, we cannot say that "every reasonable official" who reads *Garcia* and *Castro* would understand those decisions to mean that the Fourth Amendment allows two government officials to search a home for the same items or evidence but does not also allow them to search a home for the same conditions. *Wesby*, 583 U.S. at 63.

To argue otherwise, Fitzpatrick identifies two cases that she believes clearly established the unconstitutionality of Simon's conduct. First, Fitzpatrick relies on our decision in *Gardner v. Evans*, which held that a housing-code official could not, under the Fourth Amendment, search a home for housing-code violations based on a warrant issued to police officers that allowed them to search that same home for drugs. 920 F.3d 1038, 1053 (6th Cir. 2019). But *Gardner* did not establish, as Fitzpatrick suggests, that government officials may *never* rely on a search warrant issued to another government official. Rather, much like *Garcia* and *Castro*, *Gardner* simply held that one government official cannot rely on another official's search warrant when the two officials are searching for different and unrelated evidence. True, *Gardner* did not mention,

much less discuss, any of our earlier decisions, but that does not mean that *Gardner* laid down a new Fourth Amendment rule that categorically prohibits joint government searches. Indeed, the *Gardner* panel could not have adopted a rule that contradicts and effectively overrules decades of circuit precedent. *See, e.g.*, *United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017) ("One panel of this court may not overrule the decision of another panel; only the en banc court or the United States Supreme Court may overrule the prior panel.").

Second, Fitzpatrick points to the Supreme Court's decision in *Wilson v. Layne*, which held that police officers violate the Fourth Amendment when they invite members of the media to join them as they execute a search warrant. 526 U.S. 603, 614 (1999). But this, too, misses the mark. *Wilson* says nothing about whether the Fourth Amendment prohibits a joint search between two government agencies, let alone clearly establishes that such a rule exists. *See Wesby*, 583 U.S. at 63 (explaining that a clearly established rule must be "dictated by controlling authority," not simply "suggested by then-existing precedent").

As a final salvo, Fitzpatrick argues that we lack jurisdiction over her Fourth Amendment claims in this interlocutory appeal because she never alleged that Simon read the search warrant issued to Officer Hanney, which means, in her view, that certain necessary facts are missing for us to decide this appeal. But, as even Fitzpatrick herself elsewhere acknowledges, that fact is not necessary to decide whether Fitzpatrick has a clearly established right against joint government searches. And because answering that question is all that is needed to resolve the qualified immunity issue on Fitzpatrick's Fourth Amendment claims, we have jurisdiction to decide this part of Simon's interlocutory appeal. *See, e.g.*, *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 679 (6th Cir. 2013).

**B.**

Before the government can evict a person from her house, the Fourteenth Amendment's Due Process Clause generally requires that the government give the person both notice and a hearing to contest the eviction. *Flatford v. City of Monroe*, 17 F.3d 162, 167 (6th Cir. 1994). An exception to this rule exists, however, and the government may evict a person from her home without notice when there is "a special need for very prompt action" to secure an important

public interest and where the government official is "responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance." *Fuentes v. Shevin*, 407 U.S. 67, 91 (1972). But even when these "exigent circumstances" exist, *Flatford*, 17 F.3d at 167, the government must still supply the evicted person with "an adequate post-deprivation procedure" to challenge the eviction, *Harris v. City of Akron*, 20 F.3d 1396, 1401 (6th Cir. 1994). Here, the parties do not dispute that Simon never gave Fitzpatrick notice before evicting her from her home.

**1.**

When it comes to Fitzpatrick's Fourteenth Amendment claims, the issue is not whether Fitzpatrick has a clearly established right to pre-eviction notice when exigent circumstances do not exist—she does. *See Flatford*, 17 F.3d at 167 ("The Flatfords therefore have a clearly established right to a pre-eviction hearing only in the absence of exigent circumstances."). The issue instead is whether, based on the facts alleged, the so-called exigent circumstances exception applies. And here, the district court held that it does not because, at least in the district court's view, "the unsanitary living conditions [in Fitzpatrick's homes], viewed in the light most favorable to Fitzpatrick, do not necessarily describe an emergency."

Normally, a district court's decision that a material question of fact prevents qualified immunity would deprive us of jurisdiction. After all, in these interlocutory qualified immunity appeals, we have jurisdiction over only the legal issues presented in the district court's decision. *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006). But even though that is true, we still have jurisdiction here for two reasons.[1]

First, this Court has never treated the exigent circumstances exception to the notice requirement as a material question of fact that cannot be reviewed on interlocutory appeal. Indeed, in *Flatford v. City of Monroe*, this Court reversed a district court's decision that denied qualified immunity under the exigent circumstances exception after it found that the "record clearly contain[ed] facts from which a reasonable building inspector could conclude that the

---

[1]Although neither party argues that we lack jurisdiction over the Fourteenth Amendment claims, we still have an independent obligation to ensure that jurisdiction exists. *See, e.g.*, *Mickler v. Nimishillen & Tuscarawas Ry. Co.*, 13 F.3d 184, 189 (6th Cir. 1993).

occupants . . . might be imminently endangered." 17 F.3d at 168. And although we refused to do the same in *Gardner v. Evans*, it was not because we lacked jurisdiction to decide the exigent circumstances question. Rather, it was because, unlike in *Flatford*, the record did not show that the exigent circumstances existed. *See* 920 F.3d at 1057 ("Many of the violations are minor enough that they would plainly fail to justify a red tag: the smoke detector was not installed high enough, the caulk in the bathtub had deteriorated, and some of the electrical outlets were missing covers.").

Second, even if we did treat the exigent circumstances exception as a material question of fact, we can still exercise jurisdiction in an interlocutory appeal when a district court improperly assesses whether the undisputed record evidence violates the Constitution. *See Plumhoff v. Rickard*, 572 U.S. 765, 772-73 (2014); *Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014). And here, the record demonstrates that the district court's decision on that front is clearly wrong.

For one thing, Fitzpatrick has never challenged the horrid condition of her home described in the affidavit supporting the search warrant.[2] Nor has she meaningfully questioned whether those conditions created "unsanitary/unsafe living conditions." Indeed, throughout the entire case thus far, Fitzpatrick has offered nothing more than a single, conclusory sentence discussing the matter. That is, Fitzpatrick wrote in her complaint that because she was not home when Simon searched her house, she "did not need to be immediately protected (or protected at all) from the conditions inside" the home. Beyond that lone statement, however, Fitzpatrick has never argued that the condition of her home did not create an unsafe living environment and has instead focused entirely on whether the city provided her with an adequate post-deprivation procedure to challenge her eviction. The district court therefore appears to have manufactured its own question of material fact where none would have otherwise existed. *Cf. Hill*, 2021 WL 3661325, at *3 (holding that the plaintiffs forfeited the issue when they "offered no counterargument regarding [the] emergency-circumstances determination and focused instead on the general red-tagging appeal process, i.e., the post-deprivation aspect of their due-process claim").

---

[2]Fitzpatrick's counsel confirmed at oral argument that Fitzpatrick was not challenging the affidavit's description of her homes.

But regardless, even if Fitzpatrick had raised the issue, the district court's decision would still have improperly assessed whether the complaint's allegations plausibly proved a clearly established Fourteenth Amendment violation because the "record clearly contains facts from which a reasonable building inspector could conclude" that exigent circumstances existed. *Flatford*, 17 F.3d at 168. Indeed, the Lansing Housing Code provides that a "structure is unfit for human occupancy whenever the code official finds that such structure is unsafe, unlawful or, because of the degree to which the structure is in disrepair or lacks maintenance, is *insanitary*, vermin or rat infested, [or] *contains filth and contamination*." International Property Maintenance Code § 108.1.3 (2015) (emphasis added). And Michigan housing law defines "dangerous building" to include a home that is "unsanitary or unfit for human habitation" because it is "likely to cause sickness or disease." Mich. Comp. Laws § 125.539(h) (2021). Based on these regulations, any reasonable housing-code officer could conclude that a house "coated" in chicken feces—so much so that the stench "ma[de] it difficult to breath[e]" and the home could not be walked through without stepping in the feces—created unsafe living conditions that required immediate eviction. Simon is therefore entitled to qualified immunity on Fitzpatrick's pre-deprivation notice claims under the Fourteenth Amendment.

## 2.

Although Fitzpatrick devotes much of her brief to arguing that the City failed to supply her with an adequate post-deprivation process to challenge her eviction, it is clearly established that she cannot hold Simon—an inferior housing-code official—accountable for that alleged failure. *See Gardner*, 920 F.3d at 1063-64. She remains free, however, to pursue that claim against the City on remand.

## IV.

Because the undisputed facts do not show that Simon plausibly violated Fitzpatrick's clearly established rights, Simon is entitled to qualified immunity on Fitzpatrick's Fourth and Fourteenth Amendment claims. We therefore **REVERSE** the decision of the district court and remand with instructions to dismiss the claims against Simon.

———————————————

## CONCURRENCE / DISSENT

———————————————

RITZ, Circuit Judge, concurring in part and dissenting in part. I agree that Officer Matthew Simon is entitled to qualified immunity with respect to Belinda Fitzpatrick's Fourth Amendment claims. I therefore concur in Section III.A of the majority's opinion. For me, though, Fitzpatrick's Fourteenth Amendment due-process claims present a more difficult question.

Simon immediately evicted Fitzpatrick, without notice or a hearing, from her two properties at 218 S. Holmes Street and 224 S. Holmes Street. On the record before us, a reasonable officer could have determined that exigent circumstances justified the immediate eviction of Fitzpatrick from 218 S. Holmes. Thus, I agree with the majority that the district court should have granted Simon qualified immunity with respect to Fitzpatrick's Fourteenth Amendment claim as to that property. But in my view, the record is too premature to reach the same conclusion as to 224 S. Holmes, Fitzpatrick's actual residence. Considering the facts in the light most favorable to Fitzpatrick, the district court was right to deny Simon's motion to dismiss Fitzpatrick's due-process claim as to her home. Because the majority sees it otherwise, I respectfully dissent on this point.

I.

As an initial matter, I agree that we have jurisdiction over this appeal. We typically exercise jurisdiction over qualified-immunity appeals "that rest on a mixed question of law and fact." *Flint ex rel. Flint v. Kentucky Dep't of Corr.*, 270 F.3d 340, 347 (6th Cir. 2001) (citing *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc)). And the question whether the facts surrounding Simon's red-tagging of Fitzpatrick's properties, as alleged by Fitzpatrick, satisfy the exigent-circumstances exception is a mixed question of law and fact. *See Williams*, 186 F.3d at 690. Indeed, as the majority notes, we have consistently exercised jurisdiction over this issue in qualified-immunity appeals. *See Gardner v. Evans*, 920 F.3d 1038, 1057-59 (6th Cir. 2019) (reviewing at summary-judgment stage whether facts fit within exigent-circumstances

exception); *Sell v. City of Columbus*, 47 F. App'x 685, 696-99 (6th Cir. 2002) (same); *Flatford v. City of Monroe*, 17 F.3d 162, 167-68 (6th Cir. 1994) (same).

## II.

Ordinarily, the government "must provide notice and a hearing prior to eviction from a property." *Hill v. Whitford*, No. 20-2076, 2021 WL 3661325, at *2 (6th Cir. Aug. 18, 2021) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972)). That is because "evictions are a particularly significant deprivation, arguably more so than the temporary deprivation of certain pieces of property." *Gardner*, 920 F.3d at 1061 (citing *City of W. Covina v. Perkins*, 525 U.S. 234, 236 (1999)). An eviction prior to notice or a hearing means that an individual "immediately" has to "find[] a place to sleep" and can result in additional hardships. *Id.* (noting that eviction can lead to the loss of "access to a computer or the internet" and to the "mail [since it] is not delivered to red-tagged homes"). In short, an immediate eviction renders the individual homeless. *See id.* The Constitution thus guarantees an "extremely important" right to adequate notice and a hearing prior to eviction, so that residents can meaningfully respond to possible condemnations of their homes. *See Grayden v. Rhodes*, 345 F.3d 1225, 1243 (11th Cir. 2003).

True, the government may evict residents from their homes before notice or a hearing when there are "exigent circumstances." *Gardner*, 920 F.3d at 1058-59 (quoting *Flatford*, 17 F.3d at 167). This is a narrow exception, though. For an officer to be entitled to qualified immunity after evicting someone without pre-deprivation process, the record must show the circumstances surrounding the eviction posed not just any "emergency," but one where immediate eviction was "necessary and justified." *Sell*, 47 F. App'x at 698 (quoting *Flatford*, 17 F.3d at 170).

A need to protect individuals from "an immediate risk of serious bodily harm" meets that high bar. *Flatford*, 17 F.3d at 167. To illustrate, in *Flatford*, we reversed the denial of qualified immunity for city officials who evicted occupants without notice or a hearing, where the occupants "faced an immediate risk of electrocution or fire" from their apartment building's "structural failure and extensive 'wood-rot' exposed to electrical wiring and the presence of combustibles." *Id.* at 165-68. But absent such a showing of an immediate risk of serious harm,

we have denied qualified immunity. For example, in *Gardner*, we held that officials were not immune from suit after immediately evicting occupants from their homes, where the record revealed only "minor" building-code violations such as a smoke detector that was not installed high enough, deteriorating caulk in a bathtub, and electrical outlets that were missing covers, as well as other violations that were "too vague to allow one to decipher their severity, such as accumulation of 'debris.'" 920 F.3d at 1057-59.

## III.

I agree with the majority that, under these principles, Simon is entitled to qualified immunity as to his immediate eviction of Fitzpatrick from 218 S. Holmes. But at this early stage of the case, the district court was right to deny Simon qualified immunity as to 224 S. Holmes.

## A.

Start with 218 S. Holmes. Animal Control Officer Kyle Hanney's affidavit detailed the firsthand observations he made from inside that structure. Upon entry, he saw that the residence was "extremely cluttered with personal belongings that were coated in what appeared to be chicken feces." RE 24-1, Hanney Aff., PageID 441. Hanney was also overcome with "a very strong odor of ammonia making it difficult to breath[e]." *Id.* Further, "[d]ue to the excess clutter, there were only narrow walkways through the residence"; those walkways "were all coated with chicken feces forcing [Hanney] to walk through the feces." *Id.* Hanney also went down to the basement, which was "in the same . . . physical condition as the main level," with the walkways "covered with more feces, chicken feed, and other dirt/debris." *Id.* Hanney spotted a total of a "3 free roaming chickens and 8 caged chickens" inside the house. *Id.*

At the motion-to-dismiss stage, the court is generally bound by the allegations in the complaint and must consider them in the light most favorable to the plaintiff. *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562-63 (6th Cir. 2011). When a defendant raises qualified immunity as a defense, however, the plaintiff has the burden of showing that qualified immunity does not apply. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citing *Reilly v. Vadlamudi,* 680 F.3d 617, 623 (6th Cir. 2012)). As the majority notes, Fitzpatrick's complaint did not specifically challenge Hanney's observations of the conditions inside 218 S. Holmes.

And Fitzpatrick confirmed at oral argument that she does not dispute the statements made in Hanney's affidavit.  In light of Fitzpatrick's failure to contravene the affidavit's descriptions of 218 S. Holmes, I agree with the majority that a reasonable building inspector could have concluded that exigent circumstances warranted an immediate eviction for Fitzpatrick's safety. *See Flatford*, 17 F.3d at 168 (granting qualified immunity where "[t]he record clearly contain[ed] facts from which a reasonable building inspector could conclude that the occupants, and particularly the children, might be imminently endangered").  Therefore, Simon is entitled to qualified immunity with respect to 218 S. Holmes.

B.

In my view, though, the record does not support the same conclusion as to 224 S. Holmes.  For starters, Hanney's affidavit explained that he was on the scene because of a complaint about chickens inside *218 S. Holmes*.  But the tipster apparently provided no information about 224 S. Holmes, where Fitzpatrick had been living.  And while Fitzpatrick allowed Hanney to enter 218 S. Holmes, she refused Hanney's request to enter 224 S. Holmes.  So, Hanney did not see the inside of 224 S. Holmes, and the affidavit contains little to no information as to the living conditions inside the home.

Instead, Hanney's affidavit focused on his observations from the *outside* of 224 S. Holmes.  According to the affidavit, Hanney saw chickens and ducks in the backyard, being kept in unsanitary conditions.  But these facts, while suggestive of a risk to the health of the animals outside the house, fail to show a risk of serious injury to Fitzpatrick warranting her immediate eviction from inside the house.  *See Sell*, 47 F. App'x at 696 ("The health of the outside [animals] c[annot] provide . . . a basis for ordering an emergency eviction."); *see also Flatford*, 17 F.3d at 167 ("Protecting *citizens* from an immediate risk of serious bodily harm falls squarely within those 'extraordinary situations.'" (emphasis added)).

To be sure, the affidavit contains Fitzpatrick's admissions that there were two chickens inside 224 S. Holmes, as well as animal feces "that she had not cleaned."  RE 24-1, Hanney Aff., PageID 441.  Fitzpatrick additionally stated that her kitchen was "messy" and that she feared officials would find her properties "condemnable" if they viewed the inside.  *Id.*  Also, the

correction notice issued by Simon after red-tagging the house states that the "interior of [the] home [wa]s covered with a large amount of chicken feces" and that there were "[c]overs missing from some electrical switches and plugs." RE 21-1, Correction Notice, PageID 404.

For several reasons, though, these facts do not entitle Simon to qualified immunity. To start with, the exigent-circumstances analysis requires an objective inquiry. *Gardner*, 920 F.3d at 1058. Fitzpatrick's subjective belief, as a civilian, that her house was "condemnable" does not establish that exigent circumstances in fact existed in her house from the view of a reasonable building inspector. Nor does her statement establish that she was under *imminent* risk of serious injury, such that any "condemnation" of the property needed to happen immediately, without giving her the chance to remedy any code violations. In fact, it is plausible that the statement simply reflected Fitzpatrick's stress upon learning that someone had complained to government officials about her rather unorthodox pets. She may also have developed a fear of Lansing code-enforcement officials, whether because, as she alleged in her complaint, the building inspectors in Lansing had a "long history" of teaming up with other city officials to inspect homes for code violations, RE 12, Am. Compl., ¶¶ 62-63, or because she was aware the city frequently evicted residents without process, *id.* ¶ 156.**[1]** Allowing this case to proceed to discovery might illuminate exactly what Fitzpatrick meant by her comments. But for now, we must interpret her statements in the light most favorable to her. *Heyne*, 655 F.3d at 562-63. And to permit immediate eviction based on such statements would create a perverse incentive for officers to red-tag properties without first ascertaining whether the conditions inside a house truly justify an eviction.

Furthermore, while Fitzpatrick has conceded the facts in Hanney's affidavit, Fitzpatrick has not conceded the accuracy of what Simon reported about the inside of 224 S. Holmes in his correction notice. In fact, her complaint challenged his account. *See* RE 12, Am. Compl., ¶¶ 69, 71-73. Besides, we have held that minor building-code violations like missing covers from

---

**[1]**This is not the first time we have encountered a claim that Lansing code-enforcement officers violated the Fourteenth Amendment rights of property owners by red-tagging their properties. *See Hill*, 2021 WL 3661325, at *1; *Gardner*, 920 F.3d at 1044. *Gardner*, notably, involved "four different Lansing homes" that were searched and red-tagged after a "pattern" of "aggressive" searches during which code-enforcement officers teamed up with police. 920 F.3d at 1044.

electrical switches and plugs do not justify immediate eviction. *Gardner*, 920 F.3d at 1057 (denying qualified immunity where "[m]any of the violations [we]re minor," including "some of the electrical outlets . . . missing covers"). Nor does the mere "accumulation of debris." *Id.*

In any event, the few details in the record about Fitzpatrick's living conditions at 224 S. Holmes stand in clear contrast with Hanney's detailed observations of the inside of 218 S. Holmes, which included a floor-by-floor description of animal feces being "coated" over the walkways and personal belongings; 11 live chickens; and a very strong odor of ammonia making it difficult to breathe. And to the degree the limited evidence about 224 S. Holmes suggests that Simon was justified in evicting Fitzpatrick from 224 S. Holmes immediately, that suggestion is belied by the allegations in Fitzpatrick's complaint, which I would characterize more robustly than the majority does. Fitzpatrick alleged that she "did not need to be immediately protected (or protected at all) from the conditions inside" the home. RE 12, Am. Compl., ¶ 64. By itself, that is a clear enough statement to create a factual dispute as to the living conditions at 224 S. Holmes—the property where, even according to Hanney, Fitzpatrick had been living for a while. The complaint also described how Simon had not inspected the whole residence at 224 S. Holmes and how his correction notice contained deficiencies and inaccuracies. *See id.* ¶ 71 ("Simon also admitted that he was not able to do a complete inspection [of 224 S. Holmes] conflicting with his claim that [exigent] circumstances existed throughout the dwelling."); *id.* ¶ 72 ("Simon falsely claimed that insanitary conditions existed in the garage because 224 S. Holmes Street does not have a garage."); *id.* ¶¶ 69, 73 (alleging that the correction notice lacked specificity as to the "areas [that must] be cleaned and sanitized with bleach" inside 224 S. Holmes and as to how the "structure was unfit for human occupancy").

If Fitzpatrick's allegations in her complaint seem conclusory, that is not surprising, considering the case has not proceeded to discovery. But on this record, they are no more conclusory than Simon's position that the inside of 224 S. Holmes was so hazardous that Fitzpatrick could not have spent one more hour there. *See Grayden*, 345 F.3d at 1243 (recognizing exceptional hardship in being evicted with even 36 hours' notice). After all, a "messy" house does not rise to the level of an *emergency* threat to human health and safety. *See Gardner*, 920 F.3d at 1058 ("[A] living condition may be 'unsatisfactory' without rising to the

level of an emergency justifying the immediate deprivation of an exceedingly important property interest without the benefit of a hearing."). Many people have messy kitchens, and many pet owners encounter pet waste on their floors. That alone does not mean governmental authorities should be able to evict them from their homes immediately.

The parties' dispute over the conditions of Fitzpatrick's home illustrates why "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) (collecting cases). Where the facts are so underdeveloped as to support divergent interpretations, the court should leave the qualified-immunity determination for the summary-judgment stage. *See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring) (observing that the fact-intensive nature of the applicable tests makes it "difficult for a defendant to claim qualified immunity on the pleadings *before discovery*"). Perhaps further development of the record—via testimony or even photos of the inside of the residence—would vindicate Simon's position. But weighing the limited universe of facts about 224 S. Holmes in the light most favorable to Fitzpatrick, the district court correctly concluded that the facts, as they stand now, "do not necessarily describe an emergency" with respect to her living conditions there. RE 26, Dist. Ct. Op., PageID 458; *see also Koch v. Dep't of Nat. Res.*, 858 F. App'x 832, 838 (6th Cir. 2021) (noting that qualified immunity is inappropriate at the motion-to-dismiss stage unless "the 'complaint establishes the defense'" (quoting *Siefert v. Hamilton County*, 951 F.3d 753, 762 (6th Cir. 2020))).

There is a final reason to deny qualified immunity to Simon as to 224 S. Holmes. In addition to the "the clear constitutional mandate that an eviction without a hearing occur only in emergency circumstances . . . , precedents from this circuit [further] limit[] those emergency circumstances to those situations where [immediate] eviction is 'necessary and justified.'" *Sell*, 47 F. App'x at 698 (quoting *Flatford*, 17 F.3d at 170). As we have observed, "[t]here is a significant difference between 'immediate action' and immediate eviction." *Id.* at 699. Emergencies call for an immediate action, but not every emergency necessitates and justifies an immediate eviction as the sole remedy. *See id.* (reversing grant of qualified immunity and remanding where "the record d[id] not indicate whether the officers . . . reasonably believed an

emergency eviction without awaiting even an expedited hearing was necessary"); *see also Gardner*, 920 F.3d at 1058. Thus, even if the officer reasonably concluded that the situation presented an emergency, the record must also show that officer ruled out "immediate action options other than vacating the home immediately." *Sell*, 47 F. App'x at 699; *see also Flatford*, 17 F.3d at 168 (permitting immediate eviction where record showed occupants, including children, were "imminently endangered").

The record is unclear in this regard as well. Simon's argument boils down to the fact that 224 S. Holmes was "messy" and thus "unfit for occupancy." CA6 R. 18, Appellant Br., at 23. But it is unclear why Fitzpatrick could not have been given a chance to clean up the mess before being evicted. As Fitzpatrick points out, unsanitary conditions at 224 S. Holmes could have been addressed through a warning or citation, which would have notified Fitzpatrick of the need to clean up the premises. *See Sell*, 47 F. App'x at 698-99 (recognizing abatement of the unsanitary conditions and expedited pre-deprivation hearing as alternative options to immediate eviction). That the authorities had already removed the chickens by the time of the red-tagging only reinforces the fact that Fitzpatrick could have been given the opportunity to clean up the existing animal waste. Our clearly established law guaranteed her at least that much.

IV.

"An emergency eviction from one's home is a significant intrusion." *Flatford*, 17 F.3d at 168. As such, when an individual has allegedly been deprived of an "exceedingly important property interest" in this way, we must be careful not to dismiss that claim prematurely. *See Gardner*, 920 F.3d at 1058. Here, the record fails to show exigent circumstances so unsafe as to justify Simon's immediate eviction of Fitzpatrick from her home at 224 S. Holmes. Accordingly, I would affirm the district court's denial of Simon's motion to dismiss this claim, and I respectfully dissent on this point.